**OAKWOOD MOBILE HOMES, INC., Oakwood Acceptance Corporation, and Homes By Oakwood, Inc., Appellants,**

v.

**Richard CABLER and Jo Cabler, Appellees.**

**No. 08–00–00480–CV.**

Court of Appeals of Texas, El Paso.

Feb. 4, 2002.

Rehearing Overruled March 27, 2002.

David R. Pierce, Jeffrey S. Alley, Scott, Hulse, Marshall, Feuille, Finger & Thurmond, P.C., El Paso, for Appellant.

Steven C. James, El Paso, for Appellee.

Before BARAJAS, C.J., McCLURE, and CHEW, JJ.

RICHARD BARAJAS, Chief Justice.

### OPINION

This is an appeal from a DTPA fraud case. For the reasons stated, we affirm as reformed.

## I. *SUMMARY OF THE EVIDENCE*

In August of 1998, Appellees, Richard and Jo Cabler, went to Appellant's, Oakwood Mobile Homes, Inc. ("Oakwood"), lot to shop for a manufactured home. Appellees met a salesperson, Bill Patton, who showed them various homes. They ultimately decided upon a double-wide model home. Appellees described the model home as "beautiful" and "perfect." The cabinets and counter tops were straight, everything matched, the trim work was correctly fitted, and every tile was in place. After talking with Patton about the features of the home, the warranty and the guarantees, Appellees decided to purchase the home. Appellees wanted to purchase the model home, but Patton told them that they really did not want that one because it was a 1998 model. He told them the one they were ordering was a 1999 model, the newest model available at the time. Patton told Appellees that their home would be exactly like the model home on the lot and promised that everything would be done to their satisfaction. He told Appellees that Oakwood homes were superior quality homes and that if there was ever a problem during the warranty period, it would be fixed right away.

Before Appellees' home arrived, Patton called to inform them that there was another home available. A customer had ordered the home and later changed his mind. Appellees had already given notice to their landlord and had a specific date on which they needed to move out, so they wanted to inspect the new home. Appellees went to look at the home even though Patton discouraged them from doing so. The home was in two halves, the ceiling was "wavy," a wall was broken, the kitchen counters were crooked and "wavy looking." Patton suggested Appellees allow him to set up the home and told them to make a list of everything that was wrong. Once again, he stated that Oakwood would fix everything to their satisfaction. Appellees relied on Patton's promises and agreed to buy the substitute home. Patton testified that he told Appellees "that the things they wanted fixed would be fixed" but he denies telling them to make a list. Appellees then watched a video which explained their rights and responsibilities under the contract. They were presented with the necessary paperwork and admitted that they did not read every line of the "huge stack" of documents they were asked to sign. Ray Sanchez, the general manager of the Oakwood lot, summarized the information and showed them where to sign or initial.

According to the retail installment contract, Appellees' manufactured home was listed at $64,982.67. While the annual percentage rate varied over the term of the contract, the average yearly rate was 10.5246%. Appellees would be responsible for $158,884.19 in finances charges when their home was finally paid off. Thus, the total sale price of their manufactured home would be $223,866.86.

Mr. Cabler began making a list while Oakwood was putting the home together on Appellees' lot. Appellees contacted Tyson Murphy, Oakwood's General Manager, at home and he agreed to visit. Mr. Cabler walked through the home with Patton, Murphy, and a repair man, Marcos Ortiz, and they went over his list item by item. Murphy told Mr. Cabler that the set-up crew was not finished and would be back to finish between the hours of 8 a.m. and 5 p.m., Monday through Friday. He indicated that repairs would be scheduled during business hours too. Murphy also mentioned that several of the items on Mr. Cabler's list were not items that were covered under the warranty and gave Mr. Cabler the impression that he had no intention of fixing those things. At trial, the

only thing Oakwood had done was to install light globes in one of the bedrooms and outside the back door.

In January 1999, Appellees sent Oakwood a DTPA demand letter, requesting over $150,000 and rescission of the contract. On March 2, 1999, Bill Gifford, Oakwood's in-house counsel, responded to the demand letter by offering $1,000 and stated that if the situation could not be resolved, Oakwood would request a state inspection in efforts to come to an agreement on the needed repairs. On April 7, 1999, Jack Seib, another Oakwood attorney, wrote to the Texas Department of Housing and Community Affairs ("TDHCA") requesting an inspection of the Cabler home. TDHCA enforces the manufactured housing regulations contained in the Code of Federal Regulations and will send an inspector to inspect a home after installation if requested. *See* Tex.Rev.Civ. Stat. Ann. art. 5221f, § 14(h) (Vernon Supp.2002).

On May 4, 1999, Bradley Dansbee, the northern regional manager of TDHCA, inspected Appellees' home. Based on his inspection, Dansbee prepared a report identifying fourteen (14) items that Oakwood needed to repair, five (5) items the retailer needed to repair, one (1) item for the installer to repair, and five (5) items which were non-jurisdictional. Oakwood indicated by letter dated June 1, 1999, that it would take "three to four business days" to complete the repairs. After the repairs were completed, Dansbee re-inspected the home. He found that all but one of the repairs had been completed.

Dansbee testified that he can only order the manufacturer, retailer, or installer to bring particular items up to the minimum standards set by the Code of Federal Reg-

ulations. He stated that things such as the shingles not being parallel, the cabinet doors not being perfectly square, and the kitchen drawers not being cut similarly are non-codable items.[1] He stated that many of the problems with the home were a result of poor workmanship. Dansbee agreed that he would be unhappy with many of the same things Appellees complained about, such as the bowed bathroom and kitchen counter tops, the uneven dining room light, and the uneven tile behind the kitchen sink, but such things were non-codable.

In the meantime, Appellees hired their own inspector, Ralph Davis. Davis is a licensed contractor who has worked on about 150 to 175 manufactured homes. He has inspected approximately 125 manufactured homes. Davis testified as the expert for Appellees with respect to the defects and the reasonable and necessary costs to repair them.

Appellees eventually filed suit against Oakwood, Oakwood Acceptance Corporation, and Homes by Oakwood, Inc. for DTPA violations, fraud, and breach of contract. After a bench trial, the court found that Oakwood had breached an oral agreement to fix everything on the house and awarded Appellees $121,450, plus attorney's fees and costs. This appeal follows.

## II. *DISCUSSION*

Appellants present six issues on appeal. We discuss each with the appropriate standard of review below.

### A. Findings of Fact and Conclusions of Law Standard of Review

■ In a bench trial, factual and legal sufficiency challenges to the trial court's

---

1. Dansbee testified that while there are things he might think are not properly done, he cannot write up non-codable items.

findings of fact are reviewable under the same standards that are applied in reviewing evidence supporting a jury's verdict. *See Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994). We review a trial court's conclusions of *law de novo. See Austin Hardwoods, Inc. v. Vanden Berghe,* 917 S.W.2d 320, 322 (Tex.App.-El Paso 1995, writ denied).

█ In Issue No. One, Appellants maintain that the trial court erred by imposing liability for Oakwood's statement that it would make all repairs on the punch-list by using an overly literal interpretation, failing to take into account manufactured housing standards, and ignoring the fact that Oakwood made all repairs which the state inspector found necessary. Appellees argue that there is nothing in the trial court's findings of fact stating that it interpreted Oakwood's misrepresentations as a literal guarantee of perfection.

The trial court's letter ruling stated the following:

The following are my findings/order in the above referenced case....

1. The Cablers are consumers under the DTPA;

2. Defendants' conduct was knowing and intentional;

3. There was common law fraud in this transaction;

4. Defendants' [sic] breached their oral promise 'to fix everything on the house. Just make a list';

5. Actual Damages Calculation: (Remedial cost or difference in value, whichever is less).

Difference in value of House = $17,000.00
Remedial Costs: $26,775.50
 − 1,900.00
 − 2,500.00
 − 600.00
 − 3,500.00
 $18,275.50

Therefore, $17,000 is the lesser amount and is the actual damage amount awarded to Plaintiffs;

6. Mental Anguish: No award for either Plaintiff;

7. Attorney's Fees for Plaintiffs: $18,211.00
 Court of Appeals: $ 7,500.00
 Supreme Court: $ 5,000.00

8. Expenses Paid by Defendants: $ 2,500.00

9. Costs of Court Paid by Defendants;

10. Pre/Post Judgment Interest;

11. Punitive Damages: $100,000.00

12. Economic Damages are trebled (because of knowing conduct).

Oakwood argues that if the court interprets its promise to "fix everything" as a literal guarantee of perfection or even complete satisfaction, every builder who requests a punch-list would be subjected to DTPA liability. Because it made adequate repairs, Oakwood maintains that its statement cannot be the basis of DTPA or fraud liability.

Oakwood cites *Ferguson v. DRG/Colony North, Ltd.* for the proposition that terms might have different meanings in different contexts and thus its agreement to "fix everything" must be considered in the context of affordable housing. *Ferguson v. DRG/Colony North, Ltd.,* 764 S.W.2d 874 (Tex.App.-Austin 1989, writ denied). In *Ferguson,* the purchaser of an apartment complex sued because certain roof repairs were not made. *See id.* at 877. The sales contract called for the seller to make the roof "water-tight." *Id.* at 881. The Appellants argued that the term "water-tight" was ambiguous and that they should have been allowed to present extrinsic evidence showing that their duty under the contract was simply to repair visible leaks that were present at closing, not to make the roofs literally water-tight. *See id.* The court concluded that the contract was unambiguous and that the use of the term was clear. *See id.* at 882.

Oakwood also cites *Mays v. Witt,* 387 S.W.2d 688 (Tex.Civ.App.-Amarillo 1965, no writ). In *Mays,* the Mays sued the Witt Brothers for breach of a contract to re-lay floor tile. *See id.* at 689. Pursuant to a contract, the Witts were to take up the tile flooring, and "clean the floor and the bottom of the tile which has adhesive

on it-and re-lay the tile with adhesive described as Bolta Floor Epoxy Adhesive." *Id.* When Witts' employees had removed and re-laid approximately 50 percent of the tile flooring, Mays stopped the operation and refused to allow them to continue for the reason he maintained the tile was not being cleaned properly and that not all of the adhesive was being removed. *See id.* The jury found in favor of the Witts and Mays appealed. *See id.*

The court noted that the controversy stemmed from the different interpretations the parties placed on the word "clean." *Id.* at 690. The court stated that "[t]o take the position the verb 'clean' was intended to mean 'to render the tile absolutely clear of all adhesive' would be unreasonable." *Id.* The court noted that the word 'clean' was a relative term, and the jury was authorized to apply the usual and ordinary meaning.

Oakwood argues that the term "fix" is also relative and the court should have applied its ordinary meaning. Oakwood repeatedly made assurances to Appellees that they would be satisfied with their home. Patton testified that he told Appellees "that the things they wanted fixed would be fixed." Appellees were told to make a list of everything that was wrong and Patton told them that Oakwood would fix everything to their satisfaction.

However, at trial Oakwood argued that there was a "gray area" where certain blemishes and imperfections fell and were not covered under the warranty. Murphy testified that Appellees should expect imperfections because they are buying affordable housing, but admitted that customers are not told that prior to the purchase. He explained the warranty as, "if it's broken or damaged, we'll fix it."

In making its ruling that Oakwood breached its oral promise, the court considered the testimony, the reports prepared by Davis, the photographs taken by Davis and Appellees, and the report prepared by Dansbee. All of this evidence supports the court's reasonable interpretation that Oakwood knowingly made misrepresentations. There is no indication that the court applied an overly literal interpretation of the term "fix." [2] There was more than a scintilla of evidence to support the court's finding that Oakwood breached its oral promise to "fix everything." Furthermore, the evidence supports the court's application of the term "fix" and we believe it was defined by applying the usual and ordinary meaning. Issue No. One is overruled.

■ In Issue No. Two, Appellants allege that the trial court erred by ignoring Appellees' agreement that any oral statements or promises would not be enforceable. Appellants argue that the disclaimer of enforceability of oral statements acts just like an "as is" clause, and because Appellees signed the contract, they are bound by that disclaimer. Appellees maintain that the cases cited by Appellants do not stand for this proposition and argue that Appellants are attempting to enforce non-negotiated, boilerplate provisions that wipe out every false promise a retailer might make in order to induce a sale.

Appellants rely on *Prudential Ins. Co. of America v. Jefferson Assocs., Ltd.,* 896 S.W.2d 156 (Tex.1995). In *Prudential,*

---

**2.** We note that Webster's defines "fix" as "repair, mend, to improve the physical condition of." WEBSTER'S (3RD) NEW INTERNATIONAL DICTIONARY 861 (3rd ed.1993). "Fix" is also defined as "to restore to proper condition or working order; repair" and "mend, repair; redecorate; alter with the purpose of improvement." THE AMERICAN HERITAGE DICTIONARY 508 (2nd College ed.1991); THE NEW SHORTER OXFORD ENGLISH DICTIONARY 962 (Thumb index ed.1993).

Appellee, F.B. Goldman, bought a four-story office building in Austin, Texas from Prudential. *See id.* at 159. Before bidding on the building, Goldman had it inspected by his maintenance supervisor, his property manager, and an independent professional engineering firm. *See id.* The maintenance supervisor testified that Prudential's on-site property manager told him that the building was "superb," "super fine," and "one of the finest little properties in the City of Austin." *Id.* He also testified that the property manager told him that the building had no defects except for a mechanical room foundation problem. *See id.* The contract Goldman signed contained the following provision:

> As a material part of the consideration for this Agreement, Seller and Purchaser agree that Purchaser is taking the Property 'AS IS' with any and all latent and patent defects and that there is no warranty by Seller that the Property is fit for a particular purpose. Purchaser acknowledges that it is not relying upon any representation, statement or other assertion with respect to the Property condition, but is relying upon its examination of the Property. Purchaser takes the Property under the express understanding there are no express or implied warranties (except for limited warranties of title set forth in the closing documents). Provisions of this Section 15 shall survive the Closing.

*Id.* at 160.

Goldman later discovered that the building contained asbestos fireproofing. *See id.* at 159. He then filed suit claiming that Prudential misrepresented the condition of the building to him and failed to disclose that it contained asbestos which impaired its value. *See id.* At trial, the parties agreed to submit a single question to the jury concerning liability: "Do you find from a preponderance of the evidence that the Plaintiffs should be entitled to recover damages from the Defendant as the result of any wrongful conduct by the Defendant?" The jury answered this question affirmatively and awarded over $25,000,000. *See id.* at 160.

The Texas Supreme Court noted that proof of causation was required for recovery on any of Goldman's theories and questioned whether he could prove that Prudential's misrepresentations caused the injury when he agreed in the contract to purchase the property "as is." *See id.* at 160–61. The court held that the contract precluded Goldman from proving that Prudential's conduct caused him any harm. *See id.* at 161. The court noted that by agreeing to purchase something "as is," Goldman agreed to make his own appraisal of the bargain and to accept the risk that he may be wrong. *See id.* (citing *Mid Continent Aircraft Corp. v. Curry County Spraying Serv. Inc.,* 572 S.W.2d 308, 313 (Tex.1978)). Furthermore, because Goldman acknowledged that he was not "relying upon any representation, statement or other assertion with respect to the Property condition" and was instead relying upon his own "examination of the Property," the court held that Goldman's "as is" agreement negated his claim that any action by Prudential caused his injury. *See id.* at 161. The court noted that Goldman's contractual disavowal of reliance upon any representation by Prudential was an important element of their arm's-length transaction and was binding on Goldman unless set aside.

Accordingly, the court reversed the lower courts and rendered judgment in Prudential's favor. *See id.* at 164.

Appellants assert that the disclaimer of enforceability of oral statements found in the delivery instructions and the disclaimer found in the Homeowners Information form, act just like an "as is" clause and

preclude recovery. Appellees admitted that they initialed or signed these documents, but stated that they did not read every line of the "huge stack" of documents they were asked to sign. Appellees said that Sanchez summarized the information and showed them where to sign or initial. The Homeowners Information form states the following:

Everything that is included with the purchase of your home should be clearly documented on your contract to purchase. We will honor every written commitment on the contract to purchase. We cannot honor any verbal "promises" for goods or services.

The delivery instructions contained the following:

Seller WILL NOT BE RESPONSIBLE FOR ANY AGREEMENTS made by our employees other than stated in writing in this agreement, the Bill of Sale or the Conditional Sales Contract. Customer hereby acknowledges a true copy of this agreement and that he has received and discussed the Homeowner's Manual with the sales person.

Appellants also note that in the video Appellees watched, they were told that verbal promises would not be honored. Thus, Appellants maintain that they should not be bound by any oral agreements.

Appellees maintain that *Prudential* does not stand for the proposition that an "as is" agreement can have the same determinative effect in every circumstance. *See Prudential,* 896 S.W.2d at 162. Indeed, the court stated:

A buyer is not bound by an agreement to purchase something 'as is' that he is induced to make because of a fraudulent representation or concealment of information by the seller. *Weitzel v. Barnes,* 691 S.W.2d 598, 601 (Tex.1985); *Dallas Farm Mach. Co. v. Reaves,* 158 Tex. 1, 307 S.W.2d 233, 240 (1957); *Cockburn v.*

*Mercantile Petroleum, Inc.,* 296 S.W.2d 316, 326 (Tex.Civ.App.-Dallas 1956, writ ref'd n.r.e.). A seller cannot have it both ways: he cannot assure the buyer of the condition of a thing to obtain the buyer's agreement to purchase "as is," and then disavow the assurance which procured the 'as is' agreement. Also, a buyer is not bound by an 'as is' agreement if he is entitled to inspect the condition of what is being sold but is impaired by the seller's conduct. A seller cannot obstruct an inspection for defects in his property and still insist that the buyer take it 'as is'. In circumstances such as these an 'as is' agreement does not bar recovery against the seller.

We also recognize that other aspects of a transaction may make an 'as is' agreement unenforceable. The nature of the transaction and the totality of the circumstances surrounding the agreement must be considered. Where the 'as is' clause is an important part of the basis of the bargain, not an incidental or 'boiler-plate' provision, and is entered into by parties of relatively equal bargaining position, a buyer's affirmation and agreement that he is not relying on representations by the seller should be given effect. Justice Cornyn's concurring opinion argues that such factors are generally not important, and that 'as is' agreements must be given the same effect in every transaction absent fraud or adhesion. We simply disagree. We think it too obvious for argument that an 'as is' agreement freely negotiated by similarly sophisticated parties as part of the bargain in an arm's-length transaction has a different effect than a provision in a standard form contract which cannot be negotiated and cannot serve as the basis of the parties' bargain.

*Id.* at 161–62.

Appellees urge this Court to consider the nature of the transaction and the total-

ity of the circumstances of this case. Appellees argue that they are unlike the parties in *Prudential,* which the court noted were "sophisticated" and in a relatively equal bargaining position.[3] *Id.* at 162. Mr. Cabler testified that he has a tenth grade education and did not have a GED or any college credits. He also stated that he had never owned a manufactured home. Mrs. Cabler testified that she had a high school diploma and one year of college. Clearly, the transaction was not entered into by parties of relatively equal bargaining position. Additionally, unlike the "as is" clause found in *Prudential,* the disclaimers Appellants insist act like "as is" clauses were not an important part of the basis of the bargain, but were in fact incidental or "boiler-plate" provisions. Finally, Appellees testified that they relied upon Patton's promises "that the things they wanted fixed would be fixed" and agreed to buy the substitute home. Here, unlike *Prudential,* it is clear Appellees were relying on representations by the seller and those representations should be given effect.

Thus, after reviewing the totality of the circumstances, we find that the disclaimers Appellants rely upon do not act just like an "as is" clause, and that Appellees are not bound by those disclaimers. The trial court did not err by ignoring Appellees' agreement that any oral statements or promises would not be enforceable. Issue No. Two is overruled.

In Issue No. Three, Appellants attack the trial court's finding that Oakwood had no present intent to "Fix everything on the house. Just make a list." Appel-lants argue that the finding has no evidentiary support in the face of repeated repair attempts, Oakwood's involving the TDHCA, and Oakwood's successful repair of all items identified by that department. Appellees maintain that there is sufficient evidence that Appellants knowingly and intentionally violated the DTPA and that their actions constituted common law fraud.

Although it is admittedly difficult to determine the intentions of those making allegedly fraudulent representations, that is not the role of this Court:

> While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made. Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony. Since intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence. 'Slight circumstantial evidence' of fraud, when considered with the breach of a promise to perform, is sufficient to support a finding of fraudulent intent.

*Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 434–35 (Tex.1986).

The overwhelming evidence demonstrated that Oakwood did not intend to perform the repairs it had promised. Patton testified that he told Appellees "that the things they wanted fixed would be fixed." They were provided a copy of Oakwood's Mission Statement which provides in part that Oakwood's mission is to "satisfy consum-

---

**3.** In fact the court stated, "Goldman was a knowledgeable real estate investor who owned an interest in at least thirty commercial buildings. He was president of Transland Management Company, a commercial property management firm in Dallas that had developed, built, rehabilitated, owned or managed properties valued altogether at about $100 million. He had bought and sold several large investment properties on an 'as is' basis." *Prudential,* 896 S.W.2d at 159.

ers' needs for superior quality...." Appellees were told to make a list of everything that was wrong and Patton told them that Oakwood would fix everything to their satisfaction. After the home was set up, Appellees made the list of needed repairs. At the time of trial the only repair that had been performed was the installation of light globes. Appellees had to send a demand letter and then agree to a state inspection before the home was even brought into compliance with the federal standards. Those repairs were not performed until after Appellees had lived in the home for eight months.

Furthermore, Murphy testified that customers are not told that if their home comes with a "blemish" or "imperfection," such things would not be fixed. Despite the existence of a manufacturer's warranty, which Murphy characterized as covering defects and workmanship, he admitted that many blemishes and imperfections do not fall under the warranty and will not be covered. He also admitted that his salespeople do not tell customers up front that they should expect such imperfections because they are buying "affordable housing." Murphy also stated that he instructs his salespeople not to tell customers that the homes come with a "bumper to bumper warranty," because no such warranty is available. When asked if he attempted to make all of the repairs requested by Appellees, Murphy stated that he attempted "to schedule any necessary service...." He testified there were "many cosmetic issues" that were not covered by the warranty and were unresolved at the time of trial.

The trial court heard evidence of the following problems with the home:

- all of the plumbing leaked;
- the doors and windows did not operate properly;
- the roof leaked and the shingles were damaged or missing;
- the heating and cooling ducts were not properly installed;
- the marriage line between the entrance area and the kitchen allowed air to leak in;
- the kitchen cabinets had nails sticking out from the top of them;
- there were holes in the floor which allowed rodents and bugs to come into the home;
- the walls and counter tops bowed;
- the lights were mis-hung;
- the drawers and cabinet doors were crooked;
- there were holes in the outside siding;
- there was paint on the curtains; and
- many other instances of poor workmanship.

Mr. Cabler testified that when it became clear to him that Oakwood did not intend on fixing any of those items, he asked that the home be reduced in price so that he could perform the repairs himself. He was informed by Murphy that was not an option.

Thus, despite the fact that Oakwood made the repairs ordered by TDHCA, it is clear that Oakwood had no intent to fix everything on the list as promised by Patton. Murphy admitted that there are many imperfections that are not covered by the warranty and that his salespeople are aware of such items. There is more than a scintilla of evidence to support the trial court's finding. Issue No. Three is overruled.

■ In Issue No. Four, Appellants argue that the trial court erred in rendering judgment against Homes by Oakwood and Oakwood Acceptance because there was no

evidence that the retailer was their agent.[4] Appellants admit that the home was manufactured by Homes by Oakwood, sold by Oakwood, and financed by Oakwood Acceptance.

In a DTPA claim, the plaintiff need not establish contractual privity with the defendant. *See Amstadt v. United States Brass Corp.,* 919 S.W.2d 644, 649 (Tex.1996). A party's consumer status does not turn on whether there is a contractual relationship with the defendant, but rather, it is determined by the parties' relationship to the transaction. *See Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 815 (Tex.1997).

The record establishes that all three Appellants were represented by the salesperson, Patton, and the manager, Murphy, on the lot. Further, Murphy described the entities as "a vertically integrated company." He explained that the retailer, Oakwood, provided the one-year warranty on the installation of the home, while the manufacturer, Homes by Oakwood, provided the warranty for coverage of defects and workmanship. However, given their status as a vertically integrated company, Murphy admitted that Oakwood can and does on some occasions cover some of Homes by Oakwood's warranty.

The videotape shown to Appellees at the time of the transaction discusses the warranty provided by Homes by Oakwood and the financing provided by Oakwood Acceptance. The contract between Oakwood and Appellees was immediately assigned to Oakwood Acceptance. When Oakwood requested a state inspection on April 7, 1999, the letter came from all three Oakwood entities. The report prepared by Dansbee was directed to both Oakwood and Homes

by Oakwood. The repairs for both entities were completed by the same employee, Ortiz. It is clear from this evidence that all three Oakwood entities participated in the transaction with Appellees. The trial court did not err in rendering judgment against all Appellants. Issue No. Four is overruled.

## B. Abuse of Discretion Standard of Review

"A [party] who attacks the ruling of a trial court as an abuse of discretion labors under a heavy burden." *Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex.1985) (orig. proceeding). The test for abuse of discretion is not whether, in the opinion of this Court, the facts present an appropriate case for the trial court's actions. Rather, it is a question of whether the court acted without reference to any guiding rules and principles. *See Amador v. Tan,* 855 S.W.2d 131, 133 (Tex.App.-El Paso 1993, writ denied); *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). Another way of stating the test is whether the act was arbitrary or unreasonable. *See Downer,* 701 S.W.2d at 242 (citing *Smithson v. Cessna Aircraft Co.,* 665 S.W.2d 439, 443 (Tex.1984)); *Amador,* 855 S.W.2d at 133. The mere fact that a trial court may decide a matter within its discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *See Downer,* 701 S.W.2d at 242 (citing *Southwestern Bell Telephone Co. v. Johnson,* 389 S.W.2d 645, 648 (Tex. 1965)). A mere error of judgment is not

4. We note that the Manufactured Housing Act requires a consumer to assert all claims against the holder of the debt when a cause of action against a retailer or manufacturer has been filed. *See* Tex.Rev.Civ. Stat. Ann. art. 5221f, § 18(h) (Vernon Supp.2002).

an abuse of discretion. *See Loftin v. Martin,* 776 S.W.2d 145, 146 (Tex.1989).

In Issue No. Five, Appellants assert that the trial court erred by awarding Appellees' expert witness fees. Appellees agree and ask that this Court remand the cause to the trial court so that the expert witness fees of $2,500 can be omitted from the final judgment. Therefore, Issue No. Five is sustained.

 In Issue No. Six, Appellants maintain that the trial court abused its discretion by admitting the testimony of Corina Vega, another dissatisfied Oakwood homeowner, because it was not sufficiently similar and/or connected to Appellees' claim to be relevant. Appellants argue that Vega's testimony violates the doctrine of *res inter alios acta,* which forbids the introduction of collateral facts which by their nature are incapable of affording any reasonable presumption or inference as to the principal matter in dispute. Appellees argued at trial that under the exception to the doctrine, the testimony was admissible. On appeal, Appellees maintain that the admission of Vega's testimony was proper, but that if the court erred in admitting it, any error was harmless because the evidence was sufficient to support the trial court's judgment without Vega's testimony. We agree.

 The general rule in Texas is that evidence of other acts by a party with persons not a party to the lawsuit are irrelevant, immaterial, unfairly prejudicial, and thus, inadmissible. *See Southwestern Bell Telephone Co. v. Vollmer,* 805 S.W.2d 825, 831 (Tex.App.-Corpus Christi 1991, writ denied); *see also* TEX.R. EVID. 403; *Missouri Pacific Railroad Co. v. Roberts,* 849 S.W.2d 367, 369 (Tex.App.-Eastland 1993, writ denied) (holding that the doctrine of *res inter alios acta* no longer exists independent of Texas Rules of Evidence 401–404 governing the admissibility of relevant and character evidence). This Court noted the exception to the doctrine of *res inter alios acta* in *Durbin v. Dal-Briar Corp.* stating, "prior acts or transactions with other persons are admissible to show a party's intent where material, if they are so connected with the transaction at issue that they may all be parts of a system, scheme or plan." *Durbin v. Dal-Briar Corp.,* 871 S.W.2d 263, 268 (Tex. App.-El Paso 1994, writ denied) (citing *Underwriters Life Ins. Co. v. Cobb,* 746 S.W.2d 810, 815 (Tex.App.-Corpus Christi 1988, no writ)). Moreover, the rules of civil evidence allow the admission of evidence of the habit of a person, or of the routine practice of an organization, if the evidence is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice. *See* TEX.R. EVID. 406; *see also Durbin,* 871 S.W.2d at 268. For testimony of the routine practice of an organization to be admissible, it must show a regular response to a repeated specific situation. *See Pacesetter Corp. v. Barrickman,* 885 S.W.2d 256, 263 (Tex. App.-Tyler 1994, no writ); *Mediacomp, Inc. v. Capital Cities Communication,* 698 S.W.2d 207, 212 (Tex.App.-Houston [1st Dist.] 1985, no writ) (stating that evidence of the routine practice of an organization is relevant to prove that the conduct of the organization on a particular occasion was in conformity with the routine practice).

Vega testified that she and her husband met with Sanchez when they were shopping for an Oakwood home. She stated that he made representations that Oakwood homes were better quality homes and that if there were ever any problems, they would be there to fix them. Vega testified to the many problems she encountered with her Oakwood home and the

difficulties she faced in getting Oakwood to make repairs.[5] She stated that she had to file a complaint with the State and an inspection was ordered. Vega testified that Oakwood did not comply with the State inspector's orders.

We find that Vega's testimony did not show a "regular response to a repeated specific situation" on the part of Appellants. *See Pacesetter Corp.*, 885 S.W.2d at 263; *Mediacomp, Inc.*, 698 S.W.2d at 212. Nor did her testimony prove that her dealings with Appellants were "so connected with the transaction at issue that they may all be parts of a system, scheme or plan." *See Durbin*, 871 S.W.2d at 268. Accordingly, the trial court abused its discretion in admitting it. However, even without Vega's limited testimony, the overwhelming evidence, as outlined above, supports the trial court's judgment, thus any error was harmless. *See* TEX.R.APP. P. 44.1(a)(1). Issue No. Six is overruled.

Having sustained Issue No. Five, we reform the judgment by omitting the $2,500 awarded for Appellees' expert witness fees. Having overruled all remaining issues, we affirm the judgment of the trial court, as reformed.

---

**5.** These problems included damage to the floor and the wall after the hot water heater broke; doors and windows that did not operate properly; "big blobs of glue" left on the floor after the linoleum was replaced; black stains on the floor; air bubbles in the floor after the linoleum was replaced; and ripped carpet.