NO. 07-09-0343-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

SEPTEMBER 6, 2011

_____


SOUTH PLAINS LAMESA RAILROAD, LTD. AND
LARRY DALE WISENER, APPELLANTS

v.

THE KITTEN FAMILY LIVING TRUST,  APPELLEE

_____


FROM THE 99TH  DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2005-529,345; HONORABLE WILLIAM C. SOWDER, JUDGE

_____


Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.


**MEMORANDUM OPINION**


Appellants, South Plains Lamesa Railroad, Ltd. and Larry Dale Wisener, its

President (collectively SPLR), appeal a judgment entered following a jury trial in favor of

Appellee, The Kitten Family Living Trust and Jerry Kitten (collectively the Trust) in the

Trust's contract action related to the operation of water wells on SPLR's property.  In

support, SPLR asserts the trial court erred by:  (1) failing to instruct the jury panel, strike

the panel or grant a mistrial after a prospective juror spontaneously made comments favorable to the Trust during *voir dire*; (2) improperly submitting certain jury instructions while failing to submit other instructions; (3) admitting evidence of Wisener's arrest and related conversations; (4) failing to grant a mistrial when the Trust injected a reference to a prior lawsuit after being prohibited by the trial court from doing so; (5) adding to the judgment certain characteristics related to an easement; and (6) seeking reversal due to the cumulative error of issues (1)-(5). We reverse and remand for further proceedings consistent with this opinion.

## Background

### The Lease Agreement

SPLR owns a railroad right-of-way in Lubbock County, generally running southwest from Slaton, Texas (the Property).[1] In the fall of 1997, Kitten approached Wisener about purchasing SPLR's water rights for use on farmland owned by Kitten which was adjacent to the railroad. After an agreement in principle was reached, the Trust made application to the High Plains Water Underground District (District) for a permit to drill a well. On December 2, 1997, the District approved the Trust's application, thereby permitting the Trust to drill and equip a single well for the purpose of producing water from the Property. On February 6, 1998, SPLR entered into a written agreement (Lease Agreement) with the Trust for the purpose of allowing the Trust to produce water from the Property. Per the Lease Agreement's terms, the Trust

---

[1]*See South Plains Lamesa Railroad, Ltd. v. The Kitten Family Living Trust,* No. 07-06-0209-CV, 2008 Tex. App. LEXIS 603 at *2-3 n.1 (Tex.App.--Amarillo January 28, 2008, no pet.) (mem. op.) (detailed description of the Property).

2

leased SPLR's land for an initial term beginning February 6, 1998, and continuing thereafter on an annual basis, unless or until the Lease Agreement terminated by its terms. In return, the Trust agreed to pay an initial fee of $4,000.00 for the first year's rental and $500.00 per year thereafter. The parties also agreed that prior to February 6, 2009, the Lease Agreement would be reviewed by SPLR and the Trust with the intention of extending the lease for an "additional ten (10) years" at a maximum annual increase of twenty percent, subject to the parties' negotiation. The Lease Agreement provided that "[i]f default shall be made in any of the covenants or agreements of Lessee contained in this document . . . Lessor may, at its option, terminate this Lease by serving five (5) days notice in writing upon Lessee."[2]

The Lease Agreement also provided that the Trust could use the leased Property "exclusively as a site for the purpose of drilling a water well, setting casing, installation of a water pump, and the laying, constructing, maintaining, operating, replacing and removing a water pipeline for the removal of subsurface irrigation water and its transportation." The Lease Agreement further provided for a contractual easement stating that, "[i]f access to and from the Premises shall be required by use of [SPLR's] property adjacent to the Premises, such use is granted on a non-exclusive basis" and SPLR "shall have the right to designate the location or route to be used." Further, the Lease Agreement "represent[ed] the full and complete agreement between [SPLR] and [the Trust] with respect to all matters relating to the Lease of the Premises, and

---

[2]The Lease Agreement also provided that, "[u]pon the termination of this Lease in any manner herein provided, Lessee shall relinquish possession of the Premises and shall remove any Lessee-owned improvements and restore the Premises to substantially the state and environmental condition in which it was prior to Lessee's use. . . ."

supersede[d] any and all other agreements between the parties hereto relating to the lease of the Premises." Shortly thereafter, SPLR received a check from the Trust for $4,000.00, dated February 7, 1998.[3]

### The Easement Agreement

On February 17, 1998, SPLR and the Trust entered into a second written agreement, entitled *Water Well and Pipeline Easement* (Easement Agreement). In return for "Ten Dollars ($10.00) and other cash consideration," SPLR granted the Trust "a right-of-way and easement for the purpose of drilling water wells, setting casing and pumps, laying, constructing, maintaining, operating, replacing and removing a water pipeline . . . for the removal of subsurface irrigation water and its transportation" to the Trust's farm. In addition, the Easement Agreement stated that the Trust was "TO HAVE AND TO HOLD said right-of-way and easement unto [the Trust] its successors and assigns, perpetually." The Trust also received the right of first refusal to purchase the Property if SPLR abandoned its ownership interest.

### The Water District Proceedings and Subsequent Appeal

Shortly after execution of the Lease and Easement Agreements, the Trust completed a water well designed to pump 390 gallons of water per minute (gpm). After the Trust began pumping water from its well, adjoining landowners filed a protest with the District contesting the Trust's water permit. Following a hearing in May 1998, the District's Board passed a motion to disallow the Trust's permit and, among other things,

---

[3]In the lower left hand corner of the check, the Trust indicated that the check was for a "well easement." Given that the Lease Agreement provided for a contractual easement and a payment of $4,000.00 for the first year's rent, this designation would be consistent with payment of the first year's rent under the Lease Agreement.

4

required the Trust to reduce the volume of water that could be pumped from the Trust's well from 390 gpm to 69.4 gpm.

In May 1998, SPLR filed a water well application to remedy alleged procedural deficiencies in the Trust's previous application. The same adjacent landowners protested SPLR's application. In July 1998, the District's Board voted to deny SPLR's application so as to prevent a disproportionate taking of water and continued to limit the volume of water that could be pumped from any one well on the Property to 69.4 gpm. SPLR and the Trust subsequently filed an action in the 364th District Court of Lubbock County contending that the District's actions in revoking the Trust's permit application and denying SPLR's subsequent application were in error as a matter of law. The Trust reduced its pumping capacity at its well producing 390 gpm to approximately 69 gpm and then drilled three additional wells on SPLR's Property with a pumping capacity of 69.4 gpm each.

After traditional motions for summary judgment were filed by all parties, the District Court granted the District's motion for summary judgment. SPLR and the Trust subsequently appealed the judgment to this Court. *See South Plains Lamesa Railroad, Ltd. v. High Plains Underground Water Conservation District No. 1*, 52 S.W.3d 770 (Tex.App.--Amarillo 2001, no pet.). On April 17, 2001, this Court reversed the trial court's judgment holding that the District's action to prevent the pumping of a disproportionate amount of water as it related to tract size was contrary to the rule of capture as applied to underground water and was not ordered pursuant to any properly adopted rule by the District authorizing such action. *Id.* at 777-82.

5

Thereafter, the Trust upped the pumping capacity of the larger well from 69.4 gpm back to 390 gpm and it continued operating the three wells pumping 69.4 gpm. The Trust also continued to pay $500.00 per year to SPLR as provided for by the Lease Agreement for years 2001 through 2004. In July 2004, asserting the Trust was in default under the Lease Agreement for operating more than one well, SPLR sent the Trust a termination notice, setting a termination date of December 2, 2004. Despite SPLR's letter, the Trust continued to pump water from all four wells.

**This Suit**

In February 2005, the Trust brought suit against SPLR seeking a Temporary Restraining Order to prohibit SPLR from interfering with the Trust's production of water on SPLR's Property. After entry of a Temporary Restraining Order, both parties filed motions for summary judgment. In April 2006, the trial court entered judgment granting the Trust's motion and denying SPLR's motion. The judgment enjoined SPLR from interfering with the Trust's use of irrigation wells and a water line located on SPLR's Property and awarded the Trust recovery of attorneys' fees. SPLR subsequently appealed to this Court. *See South Plains Lamesa Railroad, Ltd. v. The Kitten Family Living Trust,* No. 07-06-0209-CV, 2008 Tex. App. LEXIS 603 (Tex.App.--Amarillo January 28, 2008, pet. denied) (mem. op.).

On appeal, SPLR asserted that the Lease and Easement Agreements, when construed together, were ambiguous and a trial was necessary to determine the parties' intent. Alternatively, SPLR asserted the Lease Agreement set forth the controlling agreement between the parties regarding the extraction of water and that agreement

6

had been breached. SPLR also asserted the Easement Agreement had lapsed because the Lease Agreement had been properly terminated. The Trust countered that the trial court correctly construed the Easement Agreement as an unambiguous document because the Easement Agreement superseded the Lease Agreement as a matter of law under the doctrine of "merger." *South Plains Lamesa Railroad, Ltd.,* 2008 Tex. App. LEXIS 603 at *3-4.

We found that the Lease Agreement was "*not* fully integrated into the Easement Agreement and the Easement Agreement *merely modifie[d]* the Lease Agreement in *some* respects." *Id.* at *9 (emphasis added).[4] Because the Easement Agreement did not fully supersede the Lease Agreement's terms and did not encompass the entire agreement of the parties, we found the doctrine of merger was inapplicable and that the Lease Agreement was not merged into the Easement Agreement. *Id.* We held that "*to the extent that the two contracts contained inconsistent terms,*" the two agreements, when construed together, created ambiguities. *Id.* (emphasis added). As such, then, the ambiguities' existence created fact questions that precluded the granting of summary judgment, and we reversed and remanded the cause for further proceedings

---

[4]The ambiguities at issue were whether the Trust was relegated to only drilling one well per the terms of the Lease Agreement or multiple "wells" per the Easement Agreement and whether the term of the Trust's easement was limited to ten years per the Lease Agreement or "perpetual" as described in the Easement Agreement. Per our opinion, we did not view these differing provisions as so inconsistent as to create a presumption that the "two [agreements] [could] not subsist together." *See IP Petroleum, Inc. v. Wevanco Energy, L.L.C. v. Wevanco Energy*, L.L.C., 116 S.W.3d 888, 899 (Tex.App.--Houston [1st Dist.] 2003, pet. denied).

7

consistent with our opinion. *South Plains Lamesa Railroad, Ltd.,* 2008 Tex. App. LEXIS 603 at *9-10.[5]

**Post-appeal Proceedings**

In post-appeal proceedings, the parties amended their pleadings. In February 2009, SPLR filed its *Second Amended Original Answer* asserting that the Lease Agreement controlled the parties' rights in connection with the number of wells to be drilled, the consideration to be paid and the term of the agreement while the Easement Agreement merely provided a recordable document that controlled the Trust's access to the Property. SPLR asserted the Trust breached the Lease Agreement by continuing to operate four wells instead of a single well and by failing to make yearly payments. SPLR also asserted the Easement Agreement had failed for lack of consideration, the agreements were ambiguous, and the agreement had expired pursuant to the terms of the Lease Agreement.

In February, SPLR also filed a counterclaim alleging that, despite the termination of the Lease Agreement by notice given in 2004 and/or by expiration pursuant to its own terms in 2008, the Trust has continued to pump water from the four wells. SPLR also alleged that, subsequent to the District's revocation of the Trust's original permit and its requirement that the Trust reduce its production from 390 gpm to 69.4 gpm, the parties entered into an oral agreement whereby the Trust was permitted to make-up for the

---

[5]Thus, on remand, the doctrine of law of the case precludes the trial court or a jury from relying on the doctrine of merger as a basis for granting judgment in favor of the Trust. *See Brown Forman Corp. v. Brune*, 893 S.W.2d 640, 648 (Tex.App.--Corpus Christi 1994, writ denied) ("The law of the case is a principle by which the initial determinations of questions of law in a case are held to govern throughout the subsequent stages of the case.") Further, "[i]n interpreting the mandate of an appellate court, [the trial court] should not only look to the mandate but to the opinion of the court as well." *McGoodwin v. McGoodwin*, 181 S.W.3d 870, 873 (Tex.App.--Dallas 2006, pet. denied).

District's volume restrictions by drilling three additional wells having a capacity of 69.4 gpm each. According to SPLR's allegations, the oral agreement also provided that if the Trust prevailed in the litigation against the District, the Trust would be required to discontinue pumping, or "shut in," the three smaller wells and utilize only the larger 390 gpm well. However, despite the ruling in favor of SPLR and the Trust on appeal of the District's decision in the administrative proceeding, the Trust continued to pump water from all four wells. SPLR's counterclaim asserted the Trust no longer had any right to produce water from the wells after termination or expiration of the Lease Agreement and it sought to recover the market value of the water pumped by the Trust from the date of termination until present.

In its response to SPLR's *Second Amended Original Answer*, the Trust asserted the Lease Agreement did not control the number of wells that could be drilled on the Property or the duration of the Easement Agreement. The Trust also asserted that, because the Lease Agreement had expired, its terms were irrelevant.

In April 2009, the Trust filed its *Second Amended Original Petition* asserting that it had a perpetual easement for the purpose of drilling water wells. The Trust asked the trial court to prevent SPLR from interfering with the Trust's use of the Property under the Easement Agreement due to termination or expiration of the Lease Agreement. The Trust also asserted that the Lease Agreement was superseded by the Easement Agreement under the doctrine of novation[6] as a matter of law since the two agreements

---

[6]The term "novation" is usually used to denote a type of substituted contract that has the effect of adding a party, either as obligor or obligee, who was not a party to the original contract (a fact not present in this case), *see* Restatement (Second) of Contracts § 280 (1981); which agreement has the effect of discharging the original duty, just as any substituted contract does. The term "novation" has also been

9

contained inconsistent terms, and that the Easement Agreement was, as a matter of law, the only agreement governing the rights of the parties.

**The Trial**

At trial, Kitten testified that he first approached Wisener with a proposal to buy subsurface water located under SPLR's Property and pump it to their farm. Although SPLR was not interested in selling its land, the parties subsequently executed the Lease Agreement.[7] Within two days, the Trust was drilling a well on the Property. Kitten then went to Wisener and informed him that he needed a perpetual easement to prevent his neighbors from mounting a successful challenge to his water permit. In addition, he told Wisener that the Lease Agreement's terms allowed only one well and he needed language permitting "wells" in case he lost a well and needed to come in and drill another. Because of this, he put "in the word 'wells' [in the Easement Agreement] obviously, for --- for the purpose of redrilling in case the other one failed." The parties executed the Easement Agreement approximately eleven days after the Lease Agreement was executed.

The Trust subsequently drilled a well on the Property and began pumping water at 390 gpm. When the District revoked the Trust's permit application and restricted the amount of water that the Trust could pump from any one well to 69.4 gpm, Kitten

loosely used to signify the substitution of a new fully integrated agreement for an existing completely or partially integrated agreement between the *same* or different parties. *See SecurityComm Group, Inc. v. Brocail,* No. 14-09-00295-CV, 2010 Tex.App. LEXIS 10190, at *49-50 (Tex.App.--Houston [14th Dist.] December 28, 2010, pet. denied).

[7]On cross-examination, Kitten testified that, by signing the Lease Agreement, the Trust agreed to its language and considered the Lease Agreement to be a binding legal document. After execution of the Easement Agreement, Kitten continued to pay annual rents in accordance with the Lease Agreement.

approached Wisener and Wisener told Kitten he could drill three more wells without District approval if he pumped water at no more than 69.4 gpm from each well. By agreement with Wisener, three additional wells were drilled.[8] Kitten further testified that, after a favorable decision was reached permitting him to return to pumping water at 390 gpm from the larger well, Wisener told him that he could continue to produce water from all four wells. Thereafter, from 2001 through 2004, the Trust continued pumping all four wells and paid its yearly rent of $500.00 per the Lease Agreement. In July 2004, however, SPLR's attorney sent a letter to the Trust's trustee terminating the agreement because the Trust was operating four wells on the Property when the Lease Agreement provided that "the property shall be used exclusively for the site of drilling *a* well . . . ." In 2005, the Trust tendered a $500.00 rental payment for 2005 but SPLR refused the payment.

Harvey Morton, an attorney who assisted Kitten with the drafting of the Easement Agreement, testified he was never involved in any negotiations of the Lease or Easement Agreements. Kitten came to his office with the Lease Agreement and told Morton he needed a different agreement. Morton suggested an easement agreement "because it had more permanency." He did not recall reading the Lease Agreement and was unaware the Lease Agreement had been executed.

Wisener testified the Lease Agreement represented the terms agreed upon between SPLR and the Trust. He intended that only one well be drilled and the Lease

---

[8]Kitten testified he sent a fax to Wisener asking him about 69.4 gpm wells. When asked on cross-examination whether "[he] was asking Mr. Wisener if it's okay to drill three more wells," Kitten replied, "Yes." On re-direct, Kitten testified that he sent the fax "because I had already talked to Wisener about the twenty wells; and, we had verbally agreed on three wells." His counsel asked him, "[a]nd these are the three wells that were later drilled?" Kitten responded, "Yes."

11

Agreement last ten years with renegotiation at the end of its term. Prior to signing the Lease Agreement, he testified Kitten never mentioned the necessity of an easement agreement and, when he received Kitten's check for $4,000.00, the only agreement in place was the Lease Agreement. He testified that it was only after the Lease Agreement was signed that Kitten approached him about an easement agreement to prevent his water permit from being challenged. In addition, at the time, Wisener was aware that the proposed easement agreement was "perpetual," meaning that during the term of the Lease Agreement the Trust could go on the Property "from now on." On the last draft of the Easement Agreement, Wisener testified that they added the word "wells" so that the Trust could re-drill another well if necessary. He "never intended to allow Kitten to drill more than one well at a time," but "[i]f the first well went under, he had permission to drill another."

Wisener testified that later that summer, after the District revoked the Trust's permit application, he received a fax from the Trust related to drilling additional wells because the Trust was "in desperate need of water." He testified that at that time he entered into an oral agreement with the Trust that "allow[ed] [the Trust] to drill three additional wells, and pump those wells until, if and when, South Plains Lamesa was successful defending [its permit] . . . [a]nd then [the Trust] was to shut-in the three wells. And he agreed to do that." However, after SPLR was successful in its action against the District, the Trust continued to pump water from the three additional wells while upping the pumping capacity of the original well to 390 gpm. As a result, Wisener testified that in July 2004, pursuant to the Lease Agreement, he sent a termination notice to the Trust setting a termination date of December 2, 2004. Despite the

12

termination date, however, the Trust continued to pump water from SPLR's Property. He estimated the market value of the water being pumped annually from SPLR's Property to be $42,000.00 per year, beginning in 2005. Thereafter, SPLR rested and the trial court went to the charge conference.

### Charge Conference

At the conference, SPLR objected to the questions submitted by the Trust and proposed a variety of instructions that were refused by the trial court. SPLR submitted questions on novation; whether the Trust's drilling rights were for ten years or perpetual; whether the parties' agreement was for the drilling of a "well" or "wells," whether an oral agreement was reached by the parties in the summer of 1998 allowing the Trust to drill an additional three wells pumping 69.4 gpm so long as the larger well's production was curtailed by order of the District, whether the Trust committed conversion by taking water from SPLR's Property after the Lease Agreement was terminated or expired and what amount would compensate SPLR for the Trust's conversion of SPLR's water in addition to instructions for trespass, damages for trespass, ratification, and waiver.

Instead, the trial court accepted the Trust's questions and issued the following instructions, in pertinent part, as follows:

**QUESTION NO. 1.**

Do you find *South Plains Lamesa Railroad, Limited*, and *The Kitten Family Living Trust* executed the Water Well and Pipeline Easement of February 17th, 1998, for the purpose and with the intent that this was to be the controlling agreement of the parties with regard to the rights of *The Kitten Family Trust* to drill water wells, set casing and pumps, lay, construct and maintain, operate, and replace and remove a water pipeline up to 14

13

inches in diameter for the removal of subsurface irrigation water and its transportation from a tract situated in the SE/4 of Section 23, Block 24, HE&WT Railway Company Survey, Lubbock County, Texas, to Section 3 and Section 6, Block O, D&W Survey, Lubbock County, Texas?

ANSWER "YES" or "NO".

ANSWER: _____

* * *

If you answered question No. 1 "Yes," do not answer Questions No. 2 through 5. Answer Question No. 6. Otherwise, answer the following questions:

**QUESTION NO. 2**

Did *The Kitten Family Living Trust* fail to comply with the lease agreement in December 1, 2004 by failing to shut in the three subsequently drilled wells?

ANSWER "YES" or "NO".

ANSWER: _____

The jury answered "yes" to Question One and, in accordance with the court's instructions, did not answer Questions Two through Five. In response to Question Six, the jury found that $240,000.00 was a reasonable fee for the services of the Trust's attorney. Thereafter, the trial court issued its judgment finding that the Trust had a perpetual and permanent easement for the purpose of drilling water wells with certain attendant rights, enjoining SPLR from interfering with those rights, and awarding the Trust $240,000.00 in attorneys' fees. This appeal followed.

14

**Discussion**

SPLR asserts that Question One of the charge was overly broad and not properly granulated to permit the jury to make any finding as to the parties' intent with regard to ambiguities in the Lease and Easement Agreements related to the number of wells the Trust was permitted to drill and the duration of the Trust's easement. SPLR also asserts that the trial court's failure to instruct the jury on novation prevented a finding whether the Easement Agreement extinguished the Lease Agreement and, because there was no jury finding on the elements of novation, the Trust failed to prove its cause of action. SPLR also asserts that the trial court erred by not submitting instructions that allowed the jury to determine whether the parties entered into a subsequent oral agreement modifying the terms of either the Lease or Easement Agreements regarding the number of wells the Trust was permitted to drill or operate on the Property and, based upon the pleadings and evidence, erred by not issuing an instruction asking whether the Trust committed conversion by taking water from the Property after the Lease Agreement was terminated or expired.[9] The Trust counters that the trial court properly issued a broad-form instruction and was correct in denying any instruction on an oral agreement regarding the number of wells because any oral agreement was invalid under the statute of frauds.

---

[9]Because we are deciding this appeal on SPLR's issue two, we need not list all the issues raised by SPLR in its brief.

15

## I.  Issue Two -- Jury Instructions

### A.  Standard of Review

A trial court's refusal to submit a particular instruction is reviewed by an abuse of discretion standard; S*hupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006), and a trial court abuses its discretion if it acts arbitrarily or without reference to guiding rules and principles. *Goode v. Shoukfeh*, 943 S.W.2d 441, 446 (Tex. 1997).  Although a trial court has broad discretion in submitting jury instructions, *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990*),* a jury charge must fairly place the disputed issues before the jury, *Blonstein v. Blonstein*, 831 S.W.2d 468, 471 (Tex.App.--Houston [14th Dist.] 1992, writ denied), and be legally correct.  *Valence Operating Co. v. Anadarko Petroleum Corp.* 303 S.W.3d 435, 442 (Tex.App.--Texarkana 2010, no pet.).  An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings and evidence.  *Tex. Workers Comp. Ins. Fund v. Mandlbauer,* 34 S.W.3d 909, 912 (Tex. 2000).

Further, a party is entitled to an affirmative submission of all its theories of recovery that have support in the pleadings and evidence.  *Turner v. Precision Surgical, L.L.C.,* 274 S.W.3d 245, 249 (Tex.App.--Houston 2008, no pet.) (citing *Exxon v. Perez*, 842 S.W.2d 629, 631 (Tex. 1992)).  To determine whether an alleged error in the jury charge is reversible, we consider the parties' pleadings, the evidence presented at trial, and the charge in its entirety.  *See Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n,* 710 S.W.2d 551, 555 (Tex. 1986).  When charge error relates to a contested, critical issue, the error is generally considered harmful; *see Columbia Rio*

16

*Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009) (citing *Bel-Ton Elec. Serv., Inc. v. Pickle*, 915 S.W.2d 480, 481 (Tex. 1996) (*per curiam*)), and if there is some evidence to support the submission of a question, refusal by the trial court to submit the question is reversible error. *Southwestern Bell Tel. Co. v. Thomas,* 554 S.W.2d 672, 674 (Tex. 1977).

## B. Question One

Question One is defective as a jury instruction because it does not describe any legal theory or its constituent elements. As such, the question does not accurately state the applicable law or assist the jury in applying the law to the facts of the case. In *Gray v. West,* 608 S.W.2d 771 (Tex.App.--Amarillo 1980, writ ref'd n.r.e.), this Court stated as follows:

> When a broad form submission is used, . . . it is essential that the accompanying instructions and definitions fully advise the jury of the constituent elements that must be established before the jury can find the ultimate fact. Thus, when the jury is asked whether Gray became a joint adventurer with Christesson, it must, at a minimum be told that the elements of the joint adventure West is seeking to establish are (1) mutual right of control, (2) community of interest, (3) agreement to share profits as principals and (4) agreement to share losses, costs or expenses.

*Id.* at 776-77. *See Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 44 (Tex. 2007).

Further, without a proper instruction describing the legal theory upon which the Trust relied and its elements, we are unable to ascertain whether the jury based its

17

decision upon a valid or invalid theory of recovery.[10] Given the vague wording in Question One, the jury could have based its decision on an invalid theory of recovery or simply no legal theory at all. *Compare Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000) (holding that "when a trial court submits a single broad-form liability question incorporating multiple theories of liability, the error is harmful and a new trial is required when an appellate court cannot determine whether the jury based its verdict on an improperly submitted invalid theory"); *with Thomas v. Uzoka*, 290 S.W.3d 437, 446 (Tex.App.--Houston [14th Dist.] 2009, pet. denied) (finding that because a requested instruction would not have produced a different outcome, the denial of a properly requested instruction was not harmful because appellant could not show "even a *possibility* of harm inasmuch as she received the jury finding she desired. . . .") (Emphasis in original.) Based upon Question One, we cannot determine whether a properly submitted theory constituted the basis of the jury's verdict.

Question One is also misleading and confusing. Although there was some evidence that either ambiguity may have been controlled by the Lease Agreement or the Easement Agreement, Question One focuses solely on the Easement Agreement and ignores the possibility that the jury might determine that either or both agreements were controlling with regard to the rights of the parties if the jury was given that choice. Further, per the instruction, the jury may have concluded that, if the parties' contract rights were not controlled by the Easement Agreement, the parties' rights were not controlled by any agreement. In addition, the conditional submission of Question Two

---

[10]"There can be no question that it was [plaintiff's] burden to obtain affirmative answers to jury questions as to the necessary elements of his cause of action." *Ford Motor Co.,* 242 S.W.3d at 44 (quoting *Ramos v. Frito-Lay, Inc.,* 784 S.W.2d 667, 668 (Tex. 1990)).

incorrectly presupposes that the controlling agreement of the parties contemplated more than one well and that the parties could not have subsequently agreed to an oral modification of either the Lease or Easement Agreements.

"It is fundamental to our system of justice that parties have the right to be judged by a jury properly instructed in the law," *Crown Life Ins. Co.*, 22 S.W.3d at 388, and a trial court is required to give "such instructions and definitions as shall be proper to enable the jury to render a verdict." Tex. R. Civ. P. 277. Reversal of a judgment for charge error is proper when the error probably caused the rendition of an improper verdict or probably prevented the petitioner from properly presenting the case to the appellate courts. Tex. R. App. P. 41.1, 61.1. Where, as here, a proper objection was made regarding the omission of the essential elements, the failure to include those elements is reversible error and the proper remedy is to reverse and remand for a new trial. *Ford Motor Co.,* 242 S.W.3d at 45.

While we are cognizant that Rule 277 of the Texas Rules of Civil Procedure mandates that "[i]n all jury cases the court shall, whenever feasible, submit the cause upon broad-form questions," Tex. R. Civ. P. 277, "Rule 277 is not absolute." *Crown Life Insurance Co.,* 22 S.W.3d at 390. Broad-form submission does not entail omitting elements of proof from the charge. *Diamond Offshore Mgmt. Co. v. Guidry,* 171 S.W.3d 840, 844 (Tex. 2005) (citing *Keetch v. Kroger*, 845 S.W.2d 262, 267 (Tex. 1992) (Hecht, J., concurring)). Thus, although the form of the submission may have been proper, the submission itself omitted elements of the Trust's cause of action and was insufficient to enable the jury to render a verdict. *See* Tex. R. Civ. P. 277; *Columbia Rio Grande*

19

*Healthcare, L.P.,* 284 S.W.3d 851, 856. In sum, "broader is not always better." *Harris County v. Smith*, 96 S.W.3d 230, 235 (Tex. 2002) (quoting Muldrow & Underwood, *Application of the Harmless Error Standard to Errors in the Charge,* 48 Baylor L. Rev. 815, 853 (1996)).

Accordingly, we conclude the trial court erred by overruling SPLR's objections to Question One and the instruction likely caused the rendition of an improper judgment or, at the least, prevented SPLR from properly presenting his case on appeal. We find such error harmful and reverse and remand for a new trial.

Accordingly, issue two is sustained. Because we have found trial court error in Question One of the charge caused sufficient harm requiring reversal, we need not reach SPLR's other issues on appeal. However, in the hope of facilitating future proceedings in the trial court, we address some alternative grounds that would also have required reversal.

### C. Oral Agreement

If an issue is properly pleaded and supported by some evidence,[11] a party is entitled to have controlling fact questions submitted to the jury; *Conquest Drilling Fluids, Inc. v. Tri-Flo International, Inc.*, 137 S.W.3d 299, 306 (Tex.App.--Beaumont 2004, no pet.) (citing *Triplex Communications, Inc. v. Riley*, 900 S.W.2d 716 (Tex. 1995)), and

---

[11]In determining whether there is "some" evidence, we examine the evidence to determine whether there is a more than a scintilla of evidence supporting the issue or theory of recovery while examining the record and ignoring all evidence to the contrary. *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992) (citing *Roy v. Howard-Glendale Funeral Home,* 820 S.W.2d 844, 846 (Tex.App.--Houston [1st Dist.] 1991, writ denied)). "If there is any evidence of probative value to support the question, the trial court may not refuse to submit the issue to the jury." *Murphy v. Seabarge, Ltd.*, 868 S.W.2d 929, 933 (Tex.App.--Houston 1994, writ denied).

20

when the requested instruction may have produced a different outcome, failure to submit the instruction is reversible error. *Conquest Drilling Fluids, Inc.*, 137 S.W.3d at 308 (citing *Mieth v. Ranchquest, Inc.*, 177 S.W.3d 296, 305 (Tex.App.--Houston [1st Dist.] 2005, no pet.)).[12]

In its counterclaim, SPLR asserted that, after the adverse District rulings on their permit applications, SPLR and the Trust entered into an oral agreement whereby the Trust was permitted to drill three smaller wells in addition to the original well to compensate for the reduced volume allowed by the District and, if the Trust prevailed in litigation with the District, the Trust would "shut in" those three smaller wells and pump only the 390 gpm well. At trial, both Kitten and Wisener testified to such an agreement or modification regarding the drilling of additional wells that occurred subsequent to the execution of the Lease and Easement Agreements.[13] However, Kitten's and Wisener's testimony differed on the terms of the oral agreement creating a fact issue. Kitten

---

[12]If raised by the pleadings and evidence, and if the complaining party submitted an instruction in substantially correct form, failure to submit an instruction on an issue is reversible error. *Hygeia Dairy Co. v. Gonzalez*, 994 S.W.2d 220, 224 (Tex.App.--San Antonio 1999, no pet.). The Trust does not assert that the instructions submitted by SPLR to the trial court were substantially incorrect in their form or that SPLR otherwise failed to preserve any error.

[13]A written agreement may be modified by a subsequent oral agreement. *DiMiceli v. Affordable Pool Maintenance, Inc.*, 110 S.W.3d 164, 171 (Tex.App.--San Antonio 2003, no pet.). Whether a parties' contract is modified depends on the parties' intentions and is a question of fact. *Gallagher & Co. v. Dieterich*, 270 S.W.3d 695, 702 (Tex.App.--Dallas 2008, no pet.). A modification to a contract creates a new contract that includes the new, modified provisions and the unchanged old provisions. *Wes-Tex Tank Rental, Inc. v. Pioneer Natural Resources USA, Inc.*, 327 S.W.3d 316, 319 (Tex.App.--Eastland 2010, no pet.) (citing *Greenbelt Elec. Coop., Inc. v. Johnson*, 608 S.W.2d 320, 324-25 (Tex.Civ.App.--Amarillo 1980, no writ)); *BACM 2001-1 San Felipe Rd. Ltd. P'ship v. Trafalgar Holdings I, Ltd.*, 218 S.W.3d 137, 146 (Tex.App.--Houston [14th Dist.] 2007, pet. denied) (a modification alters only those terms of the original agreement to which it refers, leaving intact those unmentioned portions of the original agreement that are not inconsistent with the modification). A party asserting a modification must prove two things: (1) notice of the change, and (2) acceptance of the change. *INTEC Systems, Inc. v. Lowry*, 230 S.W.3d 913, 918 (Tex.App.--Dallas 2007, no pet.); *Pfister, Inc. v. Moore & Kinney, Inc.*, 48 S.W.3d 341, 350 (Tex.App.--Houston 2000, pet. denied); *Ghidoni v. Stone Oak, Inc., 966 S.W.2d 573, 581 (Tex.App.--San Antonio 1998, pet. denied)*.

testified that, after the favorable court ruling on the District's claims, Wisener told him to continue pumping water from the three smaller wells. Wisener, on the other hand, testified that he issued a termination letter in July 2004 because Kitten had breached their agreement to stop pumping from the three smaller wells. Thus, an oral agreement regarding the production of water was pled by SPLR and there was some evidence at trial from both parties that such an agreement was entered into after the Lease and Easement Agreements were consummated, although there was conflicting testimony as to the terms of that agreement. Had the jury received an instruction on the existence of an oral agreement, decided in favor of its existence, and then resolved the conflicting testimony in SPLR's favor, there would have been a determination that, despite the language in the Lease and Easement Agreements, the parties modified their agreement(s) to provide for only a single well in the event a favorable ruling was received from the courts on their appeal of the District's rulings. Because a different outcome was possible, we cannot conclude that SPLR was not harmed by the omission of the requested instruction. *See Thomas,* 290 SW.3d at 445; *Conquest Drilling Fluids, Inc.* 137 S.W.3d at 308. ("If the error in the charge relates to a contested issue and the evidence is sharply conflicting, the error will likely require reversal.")

The Trust asserts the trial court correctly denied the instructions tendered by SPLR regarding an oral agreement because any oral agreement was invalid due to the statute of frauds. Without deciding whether the Trust's assertion is correct,[14] we simply note that the Trust was the first to offer testimony regarding an oral agreement entered

---

[14]Even if the agreement in question fails to meet the requirements of the statute of frauds, the agreement would be voidable, not void. *Eland Energy, Inc. v. Rowden Oil & Gas, Inc.,* 914 S.W.2d 179, 186 (Tex.App.--San Antonio 1995, writ denied).

into subsequent to the execution of the Lease and Easement Agreements related to the drilling of additional wells through Kitten's direct testimony and failed to object on the basis of statute of frauds when Wisener testified regarding a similar oral agreement. Accordingly, the Trust waived its right to assert statute of frauds in this proceeding. *Central Nat. Bank of San Angelo v. Cox*, 96 S.W.2d 746, 748 (Tex.Civ.App.--Austin 1936, no writ). *See Maxey Village, Ltd. v. Web Service Co.,* No. 14-00-00908, 2001 Tex. App. LEXIS 8443 at *3-5 (Tex.App.--Houston [14th Dist.] December 20, 2001, no pet.) (not designated for publication).

Because the trial court denied the proper submission of a valid theory of recovery asserted by SPLR in its pleadings and the evidence at trial, reversal is also warranted on this issue as well. *Exxon Corp. v. Perez*, 842 S.W.2d 629 631 (Tex. 1992) (per curiam); *Conquest Drilling Fluids, Inc.,* 137 S.W.3d at 308; *Barnett v. Coppell North Texas Court, Ltd.*, 123 S.W.3d 804, 824-25 (Tex.App.--Dallas 2003, pet. denied).

## D. Conversion

SPLR pled this theory of recovery in its counterclaim and offered some evidence at trial that the Trust had converted SPLR's subsurface water in a manner inconsistent with SPLR's subsurface water rights.[15] Although the Trust disputed at trial whether

---

[15]"The unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights, is in law a conversion." *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971). The elements of a cause of action for conversion are: (1) the plaintiff owned, had legal possession of, or was entitled to possession of the property; (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's rights; and (3) the defendant refused plaintiff's demand for return of the property. *Hunt v. Baldwin*, 68 S.W.3d 117, 131 (Tex.App.--Houston [14th Dist.] 2001, no pet.). Wrongful intent is not an element of conversion--even innocent buyers of property may be liable. *Nxcess Motor Cars, Inc. v. JP Morgan Chase Bank, N.A.*, 317 S.W.3d 462, 471 (Tex.App.--Houston [1st Dist.] 2010, pet. denied).

SPLR's termination of the Lease Agreement in July 2004 was valid, the Trust admitted that the Lease Agreement expired by its own terms in February 2008.  Further, Kitten testified at trial that the Trust continued to pump water from SPLR's Property and transport it to the Trust's farm despite SPLR's termination letter or expiration of the Lease Agreement.  In addition, Wisener testified as to the value of the water pumped annually from SPLR's land after termination or expiration of the Lease Agreement.  Accordingly, there was some evidence at trial of conversion of SPLR's subsurface water by the Trust and its value since the termination or expiration of the Lease Agreement.

Because the trial court denied the proper submission of SPLR's conversion *theory of recovery, reversal is also warranted on this issue.  See Ghidoni v. Stone Oak, Inc.,* 966 S.W.2d 573, 585 (Tex.App.--San Antonio 1998, pet. denied*) ("*If the lease was properly terminated, the jury should have been required to determine whether the subsequent removal of water by HCSA and Stone Oak was the wrongful assumption of dominion and control over the water, or conversion.")

## II.  Issue Three -- Evidence of Wisener's Arrest

### A.  Standard of Review

The admission of evidence is committed to the sound discretion of the trial judge. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005).  A trial court abuses its discretion when its decision is arbitrary, unreasonable, and without reference to any guiding rules or principles.  *Goode,* 943 S.W.2d at 446.  If an appellant can show that the trial court's evidentiary ruling was in error, he or she must further demonstrate that the "error

probably (though not necessarily) resulted in an improper judgment." *Nissan Motor Co. Ltd. v. Armstrong,* 145 S.W.3d 131, 144 (Tex. 2004) (citing *City of Brownsville v. Alvaredo,* 897 S.W.2d 750, 753 (Tex. 1995)). *See also McCraw v. Maris*, 828 S.W.2d 756, 758 (Tex. 1992) ("[I]t is not necessary for the complaining party to prove that 'but for' the exclusion of evidence, a different judgment would necessarily have resulted.") Tex. R. App. P. 44.1. In making this determination, this Court must review the entire record. *Id.* In doing so, we may look to the efforts made by counsel to emphasize the erroneous evidence and whether there was contrary evidence that the improperly admitted evidence was calculated to overcome. *Nissan Motor Co. Ltd.,* 145 S.W.3d at 144.

## B. The Admissibility of Evidence of Wisener's Arrest and Related Events

SPLR contends the trial court abused its discretion when it admitted testimony by Kitten and Walter Heinrich[16] regarding Wisener's 2004 arrest by two Slaton police officers and their subsequent conversations with Wisener.[17] At trial, both Kitten and Heinrich testified that subsequent to his arrest, Wisener sought their assistance in removing the City of Slaton mayor, police chief and the two police officers. Kitten testified Wisener told him that, if he did not assist him, he would take his water away and "get a backhoe out there to rip it out." Heinrich testified Wisener told him that "if

---

[16]In an agreement unrelated to the agreement at issue in this case, Wisener permitted Heinrich to pump water through pipelines crossing SPLR's Property.

[17]The trial court originally granted SPLR's motion *in limine* as to Heinrich's testimony but, after a proffer of his testimony at trial, reversed its prior ruling. At trial, SPLR objected to Kitten's and Heinrich's testimony as irrelevant and more prejudicial than probative, citing Texas Rules of Evidence 402 and 403 and obtained a running objection from the trial court.

you don't do this for me, then I'm going to cut your waterlines." Wisener's conversations with Kitten and Heinrich occurred in June 2004.

During Wisener's cross-examination, the Trust's counsel asked the following questions and received answers from Wisener as follows:

TRUST'S COUNSEL: You were really mad [the day you were arrested], weren't you?

WISENER: I don't think "mad" is the correct word. I was disturbed or upset.

* * *

TRUST'S COUNSEL: And [at the time of your arrest] you made some statements we wouldn't want to read the language in this courtroom, would we, to them?

WISENER: Possible.

* * *

TRUST'S COUNSEL: What did you tell them after they arrested you?

WISENER: Oh, probably that -- along the lines that they may wish they hadn't done it or something; that I was going to take action, or I'd do something about it. I don't know. Something along those lines, probably.

TRUST'S COUNSEL: Didn't you tell them, "Buddy, you don't know who I am. You just blanked up?"

WISENER: Did I say that?

TRUST'S COUNSEL: Yes, sir.

WISENER: Oh, excuse me. I'm sorry. I don't recall. If it's in the report, I'm sure I did. Like I said, I can't deny what's in there. I just don't recall.

TRUST'S COUNSEL: Okay. Did you threaten to sue the police officers and the police department, as well as the City of Slaton?

WISENER: I don't recollect.

The issues at trial revolved around the parties' intent in 1998 when SPLR and the Trust entered into the Lease and Easement Agreements, whether the parties entered into an alleged subsequent oral agreement regarding the number of wells, whether SPLR's termination of the Trust's lease in 2004 was justified under the terms of the Lease Agreement, and whether the Trust was liable for conversion. The Trust contends that evidence of Wisener's arrest in 2004 and subsequent threats made to Kitten and Heinrich were relevant to Wisener's intent and motive regarding termination of the Trust's lease because, until Wisener was arrested in 2004, there had been no problems or disputes between the parties.

### 1. Relevance

The relevancy requirement incorporates the traditional analysis of relevance under Texas Rules of Evidence 401 and 402. *Wyndham International, Inc. v. Ace American Ins. Co.,* 186 S.W.3d 682, 685 (Tex.App.--Dallas 2006, no pet.). Relevant testimony is that which is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.* (citing *E. I. Du Pont Nemours and Co., Inc. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995)). Evidence that has no relationship to the issues of the case and is not of assistance to the jury is inadmissible. *Id.*

While we do not condone Wisener's alleged behavior toward the Slaton police officers, Kitten or Heinrich, we agree with SPLR that Wisener's arrest and subsequent behavior had nothing to do with the intent of the parties regarding the execution of the Lease and Easement Agreements or their subsequent alleged oral agreement more

27

than six years earlier.[18]  Neither did Wisener's arrest and subsequent conversations with Kitten and Heinrich have anything to do with whether SPLR's termination of the Lease Agreement was or was not justified under the terms of that agreement.  Whether SPLR's termination of the Lease Agreement was justified may not be determined by what the parties intended at the time of termination---six years after the agreements were executed.  Rather, the issue is determined by deciding whether the Trust defaulted on the terms of the Lease Agreement prior to the termination notice, i.e., did the Trust perform its contractual undertakings subsequent to execution of the Lease Agreement.  Wisener's personal activities or mood prior to the issuance of the termination letters in 2004 is neither relevant nor material to any factual issue to be decided by the jury regarding termination of any agreement at issue in this case.[19]  Simply put, Wisener's basis for terminating, not his reason, was what was relevant and the testimony admitted concerning his arrest was irrelevant, i.e., the evidence added nothing to the trial and had no probative value.

---

[18]The Lease Agreement was executed by Elizabeth Kitten on behalf of the Kitten Family Trust and Wisener on behalf of SPLR while the Easement Agreement was executed solely by Wisener on behalf of SPLR.  There was no evidence at trial that Wisener was acting on behalf of SPLR at the time of his arrest or during his subsequent conversations with Kitten and Heinrich.

[19]This Court held that similar testimony was relevant in a trial between Heinrich and SPLR but did not decide whether the probative value of the evidence outweighed its prejudicial value because the issue had been waived.  *South Plains Lamesa Railroad, Ltd. v. Heinrich,* 280 S.W.3d 357, 363-64 (Tex.App.--Amarillo 2008, no pet.).  In that case, there were no written agreements and the issue was whether the parties *intended* a permanent easement or easement of convenience; *id.* at 363-64 ("[a]s such, there [was] at least a logical connection between this line of questioning and the propositions that Heinrich was attempting to prove. . . ."

## 2. Unfair Prejudice

Further, even relevant evidence may be excluded if its probative value is substantially outweighed by danger of unfair prejudice. Tex. R. Evid. 403. "Unfair prejudice" means an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one. *See National Freight, Inc. v. Snyder*, 191 S.W.3d 416, 424 (Tex.App.--Eastland 2006, no pet.).

Aside from being irrelevant, the evidence also presented "a clear danger of unfair prejudice." *See Coastal Oil & Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1, 23 (Tex. 2008). Kitten's and Heinrich's testimony was intended to portray Wisener as a criminal who disrespected and threatened police officers when he was angry and terminated the Lease Agreement not because there were valid legal reasons but for purely emotional or personal reasons. The Trust's lengthy cross-examination regarding the arrest and subsequent events had nothing to do with whether there was a valid legal basis for SPLR to terminate the Lease Agreement. Rather, it had only to do with prejudice. The Trust's cross-examination of Wisener established only that Wisener was arrested for interfering with a police officer in his duties, disagreed with how the police were conducting an arrest, over-reacted, used profanity, and refused to obey the instructions of two police officers. Further, in his closing, the Trust's counsel re-emphasized the arrest, implied Wisener did not respect law enforcement, interfered with the police officers in the performance of their duties, and threatened to sue two police officers. Once again, while we do not condone Wisener's actions, the evidence and argument by the Trust's counsel establishes that the only significance of Wisener's arrest and the

29

subsequent events stemming from the arrest was to utilize these unfortunate incidents to unfairly prejudice SPLR.

A trial court's discretion to admit or exclude evidence is not boundless. *Coastal Oil & Gas Corp.*, 268 S.W.3d at 25. Because the evidence did not tend to make any particular proposition of consequence at issue in the trial more or less likely and the significant danger of unfair prejudice presented by the evidence substantially outweighed its probative value, which was nil, we find the trial court abused its discretion in admitting the testimony into evidence.[20]

Given that the evidence had no relevancy, its prejudicial nature, the efforts made by the Trust's counsel to expand upon and emphasize the erroneous evidence, and that it was calculated to overcome evidence that Wisener terminated the Lease Agreement because the Trust did not "shut in" the three smaller wells as allegedly agreed, we

---

[20]"While the general rule in Texas is that evidence of other acts by a party with persons not a party to the lawsuit are irrelevant, immaterial, unfairly prejudicial, and thus, inadmissible," *Oakwood Mobile Homes,Inc. v. Cabler*, 73 S.W.3d 363, 375 (Tex.App.--El Paso 2002, pet. denied), the Trust argues an exception to the general rule, i.e., evidence of Wisener's arrest and subsequent conduct is admissible to show "a party's intent where material, if they are so connected with the transaction at issue that they may all be parts of a system, scheme or plan." *Id.* (quoting *Durbin v. Dal-Briar Corp.*, 871 S.W.2d 263, 268 (Tex.App.--El Paso 1994)). *See Carousel's Creamery, L.L.C. v. Marble Slab Creamery, Inc.*, 134 S.W.3d 385, 396 (Tex.App.--Houston [1st Dist.] 2004, pet. dism'd by agreement). These cases are inapposite because Wisener's intent regarding the Lease Agreement's alleged termination is not an issue in this case and the parties' execution of the Lease Agreement is neither connected nor similar to any transaction between SPLR and Heinrich. Regarding Heinrich, the Trust was not a party to, or beneficiary of, any negotiations or agreements between SPLR and Heinrich, there was no written agreement between SPLR and Heinrich, and the oral agreement between SPLR and Heinrich only pertained to the transportation of Heinrich's water over property owned by SPLR. Further, neither the transactions between SPLR and the Trust nor Wisener's inappropriate behavior toward Kitten represented a routine practice of an organization or regular response to a repeated situation. *See Oakwood Mobile Homes, Inc.*, 73 S.W.3d at 376. In fact, there was no evidence that Wisener was acting on SPLR's behalf when he was arrested or threatened to cut off Kitten's access to SPLR's subsurface water.

believe this evidence was intended to inflame the jury and might well constitute harmful error. However, because of our findings on issue two, this issue is pretermitted.

**Conclusion**

The trial court's judgment is reversed and this cause is remanded for further proceedings consistent with this opinion.


Patrick A. Pirtle
Justice


Quinn, C.J., concurring.

Campbell, J., concurring.