

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| CHRISTOPHER PACE, CATERINA ITZI, and ADAM CRAWSHAW, | § | No. 08-23-00127-CV |
| | § | Appeal from the |
| Appellants, | | |
| | § | 438th Judicial District Court |
| v. | | |
| | § | of Bexar County, Texas |
| ACES AUTOS, LLC and LENTEGRITY, LLC, | § | (TC# 2021CI26178) |
| Appellees. | § | |

## **MEMORANDUM OPINION**[1]

This case arises from the sale of a used car. Caterina Itzi and Christopher Pace, Appellants here, sued Aces Autos, LLC and Lentegrity, LLC (collectively Appellees), who respectively sold and financed the vehicle purchase. Appellants claim the vehicle has defects rendering it worthless; Appellees emphasize the vehicle was purchased "as-is" with no warranties and with ample warning that it might have mechanical problems. The trial court sided with Appellees by granting their hybrid no-evidence and traditional motion for summary judgment, and in addition, awarded sanctions against Appellants' attorney, Adam Crawshaw, for filing a frivolous claim. Itzi, Pace, and Crawshaw appeal from that judgment. We affirm in part and reverse in part.

---

[1] The appeal was transferred to this Court from the Fourth Court of Appeals pursuant to a Texas Supreme Court docket equalization order. Accordingly, we apply the Fourth Court of Appeals' precedent to the extent it conflicts with our own. *See* TEX. R. APP. P. 41.3.

## FACTUAL & PROCEDURAL BACKGROUND

We take the factual record from the summary judgment proofs submitted by the parties.

### A. Itzi and Pace agree to buy a used Jeep from Aces Autos

On July 4, 2021, Caterina Itzi contacted Aces Autos through Facebook Marketplace to ask about a 2009 Jeep Wrangler that she had seen advertised there. The next day, she and her husband Christopher Pace went to the dealership and test drove the vehicle. They noticed that the air conditioner was not working and were told that Aces Autos had replaced the instrument cluster earlier that week which might still be faulty. The sales representative offered to send the Jeep to their shop so that it could be fixed along with looking over the 4-wheel drive components for other issues. The sales representative also stated that Aces Autos had had the vehicle for three months but that it was in the shop most of that time.

That day, Itzi and Pace made a $5,000 downpayment and then left the dealership while it looked for a lender to finance the balance of the transaction and send the vehicle out for the promised repair. During the next week, Itzi provided credit related information as Aces Auto secured a lender. They completed the transaction on July 13, 2021. When Appellants arrived at the dealership, they were told that the instrument cluster was again replaced and everything was working correctly. Itzi agreed that the vehicle started and sounded okay, and that the AC was working.

Aces Autos then asked Appellants for another $3,000 dollars down so it could get the lender to approve them. Appellants then "stood up to leave" and asked for return of the $5,000 down payment. The salesperson had them stay while he talked to the lender. While they waited, Aces Auto's owner, Orlando Huc, told them that he had bought the Jeep as a personal vehicle, lots of preventative work was done, they had "chased electrical issues" on it for a long time which he

2

attributed to the instrument cluster getting wet, but that it was now fixed. Itzi testified that Huc said the Jeep was "reliable and there were absolutely no issues" with it. After the salesperson reconfirmed the sales price as originally set, they completed paperwork that we describe next.

### B. The purchase paperwork disclaims all warranties and sold the Jeep "as-is"

Either Itzi, Pace, or both signed, among other documents, the following: (1) a Conditional Sales Agreement, (2) a Disclosure Concerning Used Car Condition, (3) a "Buyers Guide," and (4) an "As-Is Sold Without Warranty" form. They also selected a Vehicle Protection Plan provided through a separate entity, ASC Warranty.

The terms of the conditional Sales Agreement provide that Itzi and Pace bought the 2009 Jeep Wrangler for $23,497.71. The single-page Disclosure Concerning Used Car Condition stated that the Jeep was "a used vehicle" with 99,925 miles. In all capital letters, it cautioned the buyers that they "SHOULD HAVE THE ABOVE REFERENCED VEHICLE INSPECTED BY A MECHANIC AND/OR A REPAIR SHOP INCLUDING A BODY SHOP OF YOUR OWN CHOICE PRIOR TO PURCHASE." The form also states, again in all capital letters "ANY EMPLOYEE, SALESPERSON OR AGENTS OF ACES AUTOS LLC THAT YOU ARE DEALING WITH ARE NOT AUTHORIZED TO MAKE OR EXPRESS AN OPINION AS TO WHAT REPAIRS MAY HAVE BEEN PERFORMED IN THE PAST." Both Itzi and Pace signed and dated the form.

They also signed a one-page document titled AS-IS SOLD WITHOUT WARRANTY (in all bold, and large font) that identified the vehicle, and in three places, in all caps stated the vehicle was sold with no warranty and the buyer would "bear the entire expense of repairing or correcting any defects that presently exist and/or may occur in the vehicle unless the salesperson promises in

3

writing at the time of the sale to correct such defects." The document appears as follows in our record (without our redactions):

# AS-IS
## SOLD WITHOUT WARRANTY

Date: 7/13/2021

Seller's Name and Address
Aces Autos LLC
9358 Bandera Rd
San Antonio, TX 78250
(210) 475-3040
County:

Acct. No. 637

Buyer's Name: Caterina Cecelia Itzi and Christopher David Pace
Address: ▮
City: San Antonio     State: TX     Zip: 78245
County: BEXAR
H. Phone: ▮     W. Phone: ▮
Cell Phone: ▮
E-mail: ▮

| New / Used | Year | Make | Model |
|---|---|---|---|
| USED | 2009 | Jeep | Wrangler |
| Mileage | Body Style | Tag No. | MVI or Serial No. |
| 99925 | LL | | 1J4GA39119L703816 |

The vehicle identified above is subject to the terms and conditions of this agreement

SELLER HEREBY EXPRESSLY DISCLAIMS ALL WARRANTIES, EITHER EXPRESSED OR IMPLIED INCLUDING ALL IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND SELLER NEITHER ASSUMES NOR AUTHORIZES ANY OTHER PERSON TO ASSUME FOR IT ANY LIABILITY IN CONNECTION WITH THE SALE OF THE VEHICLE.

"NOTICE OF VEHICLE SOLD WITHOUT ANY WARRANTY"

THIS VEHICLE IS SOLD WITHOUT ANY WARRANTY, THE BUYER WILL BEAR THE ENTIRE EXPENSE OF REPAIRING OR CORRECTING ANY DEFECTS THAT PRESENTLY EXIST AND/OR MAY OCCUR IN THE VEHICLE UNLESS THE SALESPERSON PROMISES IN WRITING AT THE TIME OF THE SALE TO CORRECT SUCH DEFECTS.

BUYER HEREBY ACKNOWLEDGES HE HAS READ, UNDERSTANDS AND ACCEPTS THE PROVISIONS OF THIS WARRANTY STATEMENT FOR THE ABOVE IDENTIFIED VEHICLE.

Buyer Signature  Caterina Cecelia Itzi     Date 7/13/2021
Witness     Date 7/13/2021

CoBuyer Signature  Christopher David Pace     Date 7/13/2021
Seller  Aces Autos LLC     Date 7/13/2021

## WARRANTY DISCLAIMER - SOLD AS-IS
PAGE 121

4

Itzi also signed acknowledging a two-page Buyers Guide, the top portion of the first page appears as follows:

## BUYERS GUIDE

IMPORTANT: Spoken promises are difficult to enforce. Ask the dealer to put all promises in writing. Keep this form.

| Jeep | Wrangler | 2009 | 1J4GA39119L703816 |
|------|----------|------|-------------------|
| VEHICLE MAKE | MODEL | YEAR | VEHICLE IDENTIFICATION NUMBER (VIN) |

**WARRANTIES FOR THIS VEHICLE:**                                   Stock No. AA703816

[X] **AS IS - NO DEALER WARRANTY**
THE DEALER DOES NOT PROVIDE A WARRANTY FOR ANY REPAIRS AFTER SALE.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

[ ] **DEALER WARRANTY**

☐ FULL WARRANTY.

☐ LIMITED WARRANTY. The dealer will pay __0__% of the labor and __0__% of the parts for the covered systems that fail during the warranty period. Ask the dealer for a copy of the warranty, and for any documents that explain warranty coverage, exclusions, and the dealer's repair obligations. *Implied warranties* under your state's laws may give you additional rights.

SYSTEMS COVERED:                    DURATION:

Further down on the Buyer's Guide, the form advised the buyer to "ASK THE DEALER IF YOUR MECHANIC CAN INSPECT THE VEHICLE ON OR OFF THE LOT." The second page of the form sets out a "list of some major defects that may occur in used vehicles" with more than 50 items arranged under headers for different vehicle components. Finally, the form stated, "**IMPORTANT**: The information on this form is part of any contract to buy this vehicle."

Appellants also secured a repair warranty from third-party-provider ACS that covered specific issues that might develop with the Jeep.

C.   **The Jeep has mechanical problems**

On July 22, 2021, the check engine light came on. Appellants took the Jeep to an auto parts store to have the computer codes read which Itzi claims showed the emissions system "had a major leak or malfunction." On August 22, 2021, according to Itzi, the Jeep "completely broke down." The battery light came on, and soon after the engine died. The engine started but died again when

5

put in gear. Appellants had it towed to one dealership that told them to replace all the spark plugs—a repair that was not covered under their ACS warranty. They had it taken to a second dealership that confirmed the Jeep's engine would die in every gear other than park and neutral. The mechanic there told them to replace the sensors and the radiator. ACS warranty paid for the radiator replacement, but not the sensor issue.[2] From July 13, 2021, through August 22, 2021, Itzi had driven the Jeep about 948 miles.

After that repair, Itzi claims the Jeep "ran great, but continued to stall randomly." Appellants later identified problems with the vehicle wiring harnesses, which they and their expert testified render the value of the vehicle as zero. Their expert identified several problems with the vehicle including that "[t]he electrical system is faulty, and shorts out once powered" and he found "burned wires" under the passenger seat.

### D. The lawsuit

In December 2021, Appellants sued Aces Autos and Lentegrity. They alleged claims (1) under the DTPA against both; (2) a count for cancellation of debt against Lentegrity; and (3) claims for common law fraud, negligent misrepresentation, deceptive advertising, breach of contract, breach of express and implied warranty, negligence, negligence per se, and failure to provide odometer disclosure statement against Aces Autos. After a period of discovery, Appellees filed a joint motion for traditional and no evidence summary judgment on the claims asserted against them. The joint motion also asked the court to sanction Appellants' attorney for filing allegedly

---

[2] They had the mechanic do some work which did not entirely fix the problem. According to the repair work order, the mechanic found the vehicle's internal diagnostics reported two codes—a CAM sensor and the CKP sensor. The mechanic replaced the CAM sensor and that code cleared. The mechanic found the wiring between the PCM and the CKP sensor was damaged with insulation missing. When he replaced the wiring, the code did not clear. He replaced the sensor and the signal was "ok until engine warms up, drops out randomly." He stated, "customer taking vehicle as is."

groundless claims. After Appellees moved for summary judgment, Appellants filed an amended petition and a response to the motion for summary judgment.[3]

A document entitled "Judge's Notes" made following a hearing on the motion for summary judgment stated that the trial court granted Appellees' motion for summary judgment on Appellants' claims and Appellees' request for sanctions. The notes also stated that attorney's fees would be submitted for consideration as sanctions. The court then conducted another hearing on the amount of attorney's fees to be assessed. The court later signed a final order granting the combined traditional and no-evidence motion for summary judgment, and assessed "$11,920 in attorney's fees and $470.40 in costs as sanctions" against Appellants' counsel. Itzi and Pace appeal the take-nothing judgment rendered against them, and their counsel appeals the sanctions assessed against him.

## TAKE-NOTHING SUMMARY JUDGMENT AGAINST ITZI AND PACE

Appellees' hybrid summary judgment motion asserted that Appellants lacked evidence on some elements of their claims. The motion also asserted a traditional summary judgment premised on the argument that the "as is" language contained in the sales paperwork defeats the causation element required for other claims.

### A. Standard of review

We review both traditional and no-evidence motions for summary judgment de novo, "taking as true all evidence favorable to the nonmovant and indulging every reasonable inference in the nonmovant's favor." *See JLB Builders, LLC v. Hernandez*, 622 S.W.3d 860, 864 (Tex. 2021); *Fibela v. Wood*, 657 S.W.3d 664, 670 (Tex. App.—El Paso 2022, no pet.). When, as here, the trial court's order does not specify the grounds for granting the summary judgment, we

---

[3] In their amended petition, Itzi and Pace dropped their claims for negligence, negligence per se, and failure to provide odometer disclosure statement.

7

must affirm the judgment on any theory presented to the trial court and preserved for our review. *Fibela*, 657 S.W.3d at 670.

A no-evidence motion for summary judgment is essentially a pretrial directed verdict, and we apply the same legal sufficiency standard of review as we would for a directed verdict. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750–51 (Tex. 2003). Under this standard, a no-evidence motion for summary judgment should be granted when: (1) there is an absence of evidence of a vital fact; (2) the court is barred by rules of evidence or law to give weight to the only evidence provided; (3) the evidence offered is no more than a mere scintilla; or (4) the evidence presented conclusively establishes the complete opposite of the vital fact. *Id.* at 751. More than a scintilla of evidence exists when reasonable and fair-minded individuals could differ in their conclusions. *Id.* Stated otherwise, there is not a scintilla of evidence when the evidence is so weak as to do no more than create a mere surmise or suspicion of material fact. *Wade Oil & Gas, Inc. v. Telesis Operating*, 417 S.W.3d 531, 540 (Tex. App.—El Paso 2013, no pet.).

Under a traditional motion, the moving party carries the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 846 (Tex. 2005). If the movant establishes its right to summary judgment, the burden then shifts to the nonmovant to present evidence which raises a genuine issue of material fact, thereby precluding summary judgment. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979).

### B.   Appellants failed to present evidence of any deceptive act by Lentegrity

Lentegrity financed the balance of the purchase price of the Jeep. Count One of the first amended petition asserts that Lentegrity committed a false, misleading or deceptive act or practice

8

through several of the DTPA laundry-list violations, and by an unconscionable course of action.[4]

"The DTPA grants consumers a cause of action for false, misleading, or deceptive acts or practices." *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996); *see* TEX. BUS. & COM. CODE ANN. § 17.50(a). The elements of a DTPA claim are: (1) the plaintiff was a consumer; (2) the defendant either engaged in false, misleading, or deceptive acts (as in violating a specific laundry-list provision of the DTPA) or engaged in an unconscionable action or course of action; and (3) the DTPA laundry-list violation or unconscionable action was a producing cause of the plaintiff's injury. *Amstadt*, 919 S.W.2d at 649. *Bus. Staffing, Inc. v. Jackson Hot Oil Serv.*, 401 S.W.3d 224, 236 (Tex. App.—El Paso 2012, pet. denied). Lentegrity's motion asserted that Pace and Itzi lack any evidence for any act of deception.

Appellants responded that several of the documents at the dealership include Lentegrity's name, and that the dealership secured Lentegrity as the lender. From this, Appellants contend that Lentegrity is inextricably intertwined in the transaction. They point us to the Texas Supreme Court's holding in *Knight v. Int'l Harvester Credit Corp.*, 627 S.W.2d 382 (Tex. 1982). That case holds that an entity whose financing is integrated with, and integral to, the purchase of goods can be liable under the DTPA. *Id*. at 388. A lender's integration into the sale process means that it is doing more than just extending credit, which by itself is neither a good or service actionable under the DTPA. *Id*. But that only shows that Appellants were "consumers" under the DTPA. It does not answer the question of whether Lentegrity engaged in any actionable conduct. In *Knight*, the lender arguably violated a DTPA laundry-list provision by including a waiver provision in its contract

---

[4] Those laundry-list claims include sections: 17.46(b)(2) (causing confusion or misunderstanding as to source, sponsorship or approval of goods or services); 17.46(b)(3) (causing confusion or misunderstanding as to affiliation, connection, or association with, or certification by another); 17.46(b)(5) (misrepresentations about a product's characteristics, uses, and benefits); 17.46(b)(7) (misrepresentations about a product's standard, quality, or grade); 17.46(b)(10) (advertising goods or services with intent not to supply a reasonable expectable public demand); 17.46(b)(24) (failure to disclose information with intent to induce another to enter transaction). TEX. BUS. & COM. CODE ANN. § 17.46(b).

9

that is specifically prohibited by law. *Id*. at 385, 388. Here, Appellants' evidenced no act by Lentegrity that fits any of the DTPA violations they alleged.

They produced no evidence of any direct communication between themselves and Lentegrity. They produced no evidence of any communication or dealing between Aces Auto and Lentegrity, other than the written credit application and the financing agreement. And unlike *Knight*, they point to nothing illegal or improper in that paperwork. Even assuming Appellants were consumers as to Lentegrity, they produced no evidence that *its* conduct violated the DTPA.

Instead, they rely on a clause in the loan agreement that provides:

> NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. . . .

From this clause, Appellants reason they can impute Aces Autos' liability onto Lentegrity. This specific clause is mandated by the Federal Trade Commission. 16 C.F.R. § 433.2. The provision, however, does not create vicarious DTPA liability between the seller and a lender, but only allows Appellants to recover from Lentegrity to the extent of the consideration paid. The Texas Supreme Court addressed this specific issue in *Home Sav. Ass'n v. Guerra*:

> These guidelines limit the creditor's derivative liability to the amount paid under the contract. A rule of unlimited liability would place the creditor in the position of an absolute insurer or guarantor of the seller's performance. We do not construe this to be the purpose of the FTC rule. We hold that a creditor's derivative liability for seller misconduct under the FTC rule is limited to the amount paid by the consumer under the credit contract.

*Home Sav. Ass'n v. Guerra*, 733 S.W.2d 134, 136 (Tex. 1987). As *Guerra* recognizes, "[t]he DTPA does not attach derivative liability to a defendant based on an innocent involvement in a business transaction." *Id*. Rather, "[a]lthough a consumer suing under the DTPA need not establish contractual privity with the defendant, he must show that the defendant has committed a deceptive

10

act which is the producing cause of the consumer's damages." *Id. Guerra* acknowledges that there might be independent liability for a lender who itself commits a deceptive act, but Appellants never put on evidence of any such act by Lentegrity. Nor did they ever plead any claim of derivative liability under the FTC rule. We therefore affirm the no evidence summary judgment as to Lentegrity.

### C. The as-is clause in the sales paperwork defeats Appellants' other claims

Each of Appellants' claims require proof that an act by the Appellees caused their claimed injury. A claim based on breach of warranty or violations of the deceptive trade practices act requires a showing of either proximate or producing causation. *See Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 667 (Tex. 1999) ("liability for breach of warranty requires a showing of proximate cause"); *Doe v. Boys Clubs of Greater Dallas*, 907 S.W.2d 472, 478 (Tex. 1995) (deceptive trade practices act violation requires evidence of producing causation). Causation also is an element for fraud, fraudulent inducement, statutory fraud, fraudulent representation, and negligent misrepresentation claims. *See Si Kyu Kim v. Harstan, Ltd.*, 286 S.W.3d 629, 634–35 (Tex. App.—El Paso 2009, pet. denied). Finally, causation is an element of a breach of contract claim. *See The Velvet Snout, LLC v. Sharp*, 441 S.W.3d 448, 451 (Tex. App.—El Paso 2014, no pet.).

But when a buyer accepts goods "as-is," they may have conceded that the seller did not cause any of their claimed economic loss in purchasing a defective product. *See Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995). That is, a valid "as-is" clause included in the parties' agreement negates a claim that some action by the seller caused the buyer's damages. *See id.* at 161 ("Goldman's 'as is' agreement negates his claim that any action by Prudential caused his injury."). The rationale for this rule is that "[a] valid 'as is' agreement . . .

11

prevents a buyer from holding a seller liable if the thing sold turns out to be worth less than the price paid because it is impossible for the buyer's injury on account of this disparity to have been caused by the seller." *Id.* Rather, "[t]he sole cause of a buyer's injury[,] by his own admission, is the buyer himself." *Id.*

The court in *Prudential* applied this rule in the purchase of an office building by sophisticated commercial entities. *Id*. at 159–60. The sales contract contained this as-is clause:

> As a material part of the consideration for this Agreement, Seller and Purchaser agree that Purchaser is taking the Property "AS IS" with any and all latent and patent defects and that there is no warranty by Seller that the Property is fit for a particular purpose. Purchaser acknowledges that it is not relying upon any representation, statement or other assertion with respect to the Property condition, but is relying upon its examination of the Property. Purchaser takes the Property under the express understanding there are no express or implied warranties (except for limited warranties of title set forth in the closing documents). Provisions of this Section 15 shall survive the Closing.

*Id.* at 160. Years later, asbestos was found in the building and the purchaser sued the seller for DTPA violations, fraud, negligence, and bad faith. *Id.* at 160. The purchaser prevailed in the lower courts, but not at the Texas Supreme Court. That court concluded that the purchaser's "agreement to buy the Jefferson Building 'as is' precludes him from proving that Prudential's conduct caused him any harm. By agreeing to purchase something 'as is', a buyer agrees to make his own appraisal of the bargain and to accept the risk that he may be wrong." *Id*. at 161.

But the court went on to suggest limitations on this rule. *Id.* at 162. If the "as is" agreement is fraudulently induced by a misrepresentation, it will not be enforced. *Id.* Nor may a seller obstruct the buyer's right of inspection and still rely on an "as is" provision. *Id.* Courts must also consider the nature of the transaction and the totality of the circumstances of the agreement. *Id*. Those circumstances include whether (1) the "as is" agreement is an important part of the basis of the bargain or an incidental or "boilerplate" provision; and (2) whether the parties have relatively equal bargaining positions. *Id.* ("We think it too obvious for argument that an 'as is' agreement freely

12

negotiated by similarly sophisticated parties as part of the bargain in an arm's-length transaction has a different effect than a provision in a standard form contract which cannot be negotiated and cannot serve as the basis of the parties' bargain.").

Whether an "as is" agreement is enforceable is a question of law that we review de novo. *Pogue v. Williamson*, 605 S.W.3d 656, 665 (Tex. App.—Houston [1st Dist.] 2020, no pet.); *see also Gym-N-I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 912 n.10 (Tex. 2007) ("Normally, under *Prudential,* a court must first determine whether the 'as is' clause is enforceable.").

Appellants do not dispute the inclusion of the as-is clause, but urge two of the exceptions from *Prudential* apply here. First, they contend the agreement to buy the Jeep was procured through false assurances about the value or condition of the vehicle. Second, they contend that the totality of the circumstances shows the provision was not an important part of the contract and they lacked equal bargaining power. Before addressing these specific claims, we step back to survey how other courts have addressed as-is clauses in comparable consumer transactions.

We are not the first court to consider the effect of as-is clauses in a used car transaction. The Fifth Court of Appeals concluded that an as-is clause that informed the buyer they would be responsible for all repair bills did not negate producing cause where the buyer's claim had nothing to do with repairs. *Bishop v. Creditplex Auto Sales L.L.C.*, No. 05-15-00395-CV, 2016 WL 3453633, at *1 (Tex. App.—June 23, 2016) (mem. op.), *appeal after remand*, 2018 WL 4090528 (Tex. App.—Dallas August 28, 2018, pet. denied) (mem. op.). The buyer's complaint in that case was that she was promised the option to trade in the car a year later—an option that was precluded because of frame and unibody damage that the dealership knew about. *Id.* at *2. The court found that *Prudential*'s exceptions to enforcement of the as-is clause applied because: 1) the difference in the buyer and seller's sophistication; 2) the as-is clause addressed repairs, while the case turned

13

on marketability of the vehicle; and 3) the as-is clause was not important to the transaction, as it was only contained on a window sticker as with every other car on lot. *Id*. at *5.

The *Bishop* court cites an earlier San Antonio Court of Appeals decision that similarly held an as-is clause on the window sticker did not defeat a DTPA claim. *Padgett's Used Cars & Leasing, Inc. v. Preston*, No. 04-04-00579-CV, 2005 WL 2290249, at *1 (Tex. App.—Sept. 21, 2005, no pet.) (mem. op.). The San Antonio court's decision rested on two arguments. First, it viewed the window sticker as boilerplate when no signed contract contained the as-is clause. *Id*. at *2. Second, the dealer in that case made three distinct presale representations that the evidence showed it knew to be false *Id*. at *1 (that the odometer showed 56,654 miles when it had turned over once and perhaps twice; that the previous owner was an elderly man who infrequently drove the car; and the car had never been in an accident).

Finally, Aces Auto points us to *Santibanez v. Diron*, No. 01-16-00231-CV, 2017 WL 343609, at *1 (Tex. App.—Houston [1st Dist.] Jan. 24, 2017, no pet.) (mem. op.) where the court upheld a summary judgment enforcing an as-is clause found on the "buyer's guide" for a used car. The controlling issue in that case, however, was one of summary judgment procedure. The plaintiff submitted no summary judgment evidence, but claimed the defendant car dealership carried the summary judgment burden to *negate* the *Prudential* exceptions. *Id*. The Houston First disagreed and declined to apply the exceptions when no record evidence could support them.[5] *Id*. at *2–3.

Applying the lessons from these cases, we conclude Appellants failed to invoke the exception from *Prudential*. First, they fail in their briefing and evidence to explain and meet all

---

[5] We find some limited guidance from our own cases. This court declined to give preclusive effect to an as-is clause in a case over the purchase of a defective mobile home. *Oakwood Mobile Homes, Inc. v. Cabler*, 73 S.W.3d 363, 372 (Tex. App.—El Paso 2002, pet. denied). That case, like *Padgett's*, concluded the parties were not relatively equal in bargaining position, the clause was boilerplate, and the buyer relied on the seller's promises that certain items would be fixed. *Id.* We also declined to enforce an as-is clause in a commercial real estate purchase based on the disparity of sophistication between the parties and the existence of a fraudulent representation underpinning the sale. *Harstan, Ltd. v. Si Kyu Kim*, 441 S.W.3d 791, 797–98 (Tex. App.—El Paso 2014, no pet.).

the elements for a fraudulent inducement claim. Second, the documentation here goes beyond boilerplate, and the evidence of the transaction shows it to be an arm's-length transaction where the participants should be responsible for the documents they signed.

A party fraudulently induced to enter a contract is not always bound by the terms found within the contract. *See, e.g.*, *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 331 (Tex. 2011). Both *Bishop* and *Padgett's* relied on fraudulent inducement as part of their rationale for declining to enforce an as-is clause. *Bishop*, 2016 WL 3453633, at *6; *Padgett's*, 2005 WL 2290249, at *2 (referring to misrepresentations as blatant and false); Appellants' brief correctly sets out the elements for fraudulent inducement. "To succeed on this theory, the buyer must show that the defendant made a material representation; the defendant was either aware that the representation was false or that he lacked knowledge of its truth; the defendant intended for the plaintiff to rely on the misrepresentation; the plaintiff relied on the misrepresentation; and the plaintiff's reliance caused Plaintiffs' damages." *Pogue*, 605 S.W.3d at 665–66 (citing *Int'l Bus. Mach. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228 (Tex. 2019)).

And Appellants briefing identifies some verbal representations made to them (the dealership had the vehicle three months, the owner acquired it for personal use, preventative work was done on it, they chased electrical issues, the Jeep was reliable and there were no issues with it). But the briefing does not discuss each element of fraud as applied to this case, and where we can find proof of them in the summary judgment record.[6] It does not, for instance, explain why Aces Auto would have known any of these representations were false when made. At most, we are generally directed to Itzi's four-page affidavit. The affidavit, however, omits any statement that

---

[6] *See Gutierrez v. Gutierrez*, 662 S.W.3d 573, 592 (Tex. App.—El Paso 2022, no pet.) (citing *Pat Baker Co. v. Wilson*, 971 S.W.2d 447, 450 (Tex. 1998)) ("Simply mentioning an issue in passing does not assign that issue for [the Court's] review; parties asserting error on appeal still must put forth some specific argument and analysis showing that the record and the law supports their contentions.").

15

Appellants relied on a particular representation. That kind of proof is necessary to assert a fraudulent inducement claim. *See Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998) ("Presidio's president, Bob Burnette, testified that Presidio did in fact rely on this representation in preparing its bid."); *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 502 (Tex. 2001) (witness testified "that he would not have planted Cherokee in 1993 and 1994 had the brochure not represented Cherokee was a good dryland variety").

The failure of proof is further complicated by the disconnect between the specific representations complained of, and the current problems with the Jeep. When Appellants test drove the vehicle, they noticed that the air conditioner did not work and were told that it might be due to the instrument cluster that had been replaced the previous week. The salesperson offered to send it to their shop to have that fixed, and to look over the 4-wheel drive components. When they returned eight days later to complete the transactions, they were told the instrument cluster had been replaced again. In our own search of the record, we find some indication this specific representation may not have been true.[7] But we are left to speculate how any issue with the instrument cluster relates to the stalling problems over which Appellants now complain.[8] They were concerned with the non-functioning air conditioner, which Itzi acknowledge was fixed when they picked up the vehicle.

---

[7] Ace's owner submitted an affidavit that itemized the several repairs that Aces Autos made to the Jeep with invoices supporting each claimed repair. The affidavit and records show that the instrument cluster was replaced only once—on June 30th—and not again as was promised to Appellants.

[8] Pace and Itzi's expert's report states that "[t]he primary and secondary causes of premature engine shutdown is caused by the repaired emissions system, catalytic converter, and poorly wired electrical system." He concluded that the "electrical system is faulty, and shorts out once powered" and found burned wires under the passenger seat. But he does not connect this to the instrument cluster, and indeed our record never explains what that term even means.

16

Appellees carried their burden to show that Appellants signed agreements that conspicuously state they were buying the Jeep as-is. That shifts the burden to Appellants to evidence a *Prudential* exception such as common law fraud. *Santibanez*, 2017 WL 343609, at *1. But the summary judgment evidence—even when viewed in the light most favorable to Appellants—fails to contain some evidence for each element of fraud.

We turn then to the other *Prudential* exception focused on totality of the circumstances, which asks whether: (1) the "as is" agreement is an important part of the basis of the bargain or an incidental or "boilerplate" provision; (2) the parties have relatively equal bargaining positions; and (3); the contract was an arm's-length transaction. *Prudential*, 896 S.W.2d at 162.[9]

The as-is language appears in two documents that collectively state three times that the vehicle was sold "as-is". One of those documents, which we reproduce above, is titled, in all bold and larger font "AS-IS." Each document was actually signed by one or both of the Appellants. The Buyer's Guide has a place to check either that the transaction is as-is or that a dealer warranty is provided. When a form provides buyers with two options for acceptance of the condition of property: one "as-is" and one with some kind of warranty, the form "is by definition negotiable and not boilerplate." *Van Duren v. Chife*, 569 S.W.3d 176, 186–87 (Tex. App.—2018), *disapproved on other grounds, Sealy Emergency Room, L.L.C. v. Free Standing Emergency Room Managers of Am., L.L.C.*, No. 22-0459, 2024 WL 735942 (Tex. Feb. 23, 2024). And unlike *Padgett's*, where the Buyer's Guide was unsigned and simply a window sticker, 2005 WL 2290249, at *1, the Buyer's Guide here is a front and back document, with the backside listing multiple possible problems that the car could have. Pace signed and acknowledged this document.

---

[9] Prudential also recognized another exception where the buyer is prevented from inspecting the goods, but no party suggests that exception is in play here. *Prudential*, 896 S.W.2d at 162.

17

The record would also support that each party possessed bargaining power in this transaction. Itzi's affidavit states that when they arrived to pick up the car, Aces Auto asked for $3,000 more dollars. Appellants then stood up to leave and asked for their money back. The dealer then backed off its request. Huc's affidavit states that he advised Appellants to buy a third-party warranty on the vehicle and "Aces reduced the price of the vehicle so that [Appellants] could afford this protection." The sales paperwork also shows that Appellants had a choice of three coverages from ACS and initialed the "Platinum Drivetrain" plan. Both sides' version of events reflect the kind of give and take in a bargained-for exchange.

The record contains little information of Appellants' background, other than they are married and work on a ranch. While we agree the record infers that Aces Auto has relatively more experience and sophistication in buying and selling cars, if this were a sole determining factor, then no disclaimer in any car dealership paperwork with an average car buyer would be free from question. In sum, each party had relatively equal bargaining power in this transaction.

The last consideration is whether the transaction is arm's length. In this context, the term refers to a transaction between those without some special relationship. *See Pogue*, 605 S.W.3d at 667–68 (citing *Schlumberger Technology Corp. v. Swanson*, 959 S.W.2d 171, 175–177 (Tex. 1997) (examining whether fiduciary, confidential, partnership, or other special relationship existed between parties)).[10] No special relationship between the parties is shown on our record, and Appellants' brief acknowledges this was an arm's-length transaction.

The sales documents that Appellants signed were different from, and more detailed than the car buyers in *Bishop* and *Padgett's*. And the fraudulent inducement claims apparent in *Bishop*

---

[10] Black's Law Dictionary provides this definition: "Of, relating to, or involving dealings between two parties who are not related or note on close terms and who are presumed to have roughly equal bargaining power; not involving a confidential relationship." *Arm's-length*, BLACK'S LAW DICTIONARY (10th ed. 2014).

and *Padgett's* were never proven here. In sum, Appellants have not presented a factual basis that permits us to ignore the terms contained in the documents that they signed.

### D. Conclusion

We conclude Appellants did not carry their burden to negate the effect of the "as is" language in the documents they signed. Therefore, the agreement negated the element of causation essential to all their claims against Aces Auto. Accordingly, Appellees proved they were entitled to a take-nothing summary judgment as a matter of law.

## SANCTIONS ASSESSED AGAINST CRAWSHAW

The trial court granted Appellees' motion for sanctions and ordered Crawshaw to pay $11,920 in attorney's fees and $470.40 in costs as sanctions. The basis for the motion as argued below focused on the claims against Lentegrity and not Ace's Autos.

### A. Standard of review & applicable law

"Our analysis of a motion for sanctions filed under [Texas Civil Practice and Remedies Code] Chapter 10 is the same as our review of a motion filed under [Texas Rule of Civil Procedure] 13." *WWW.URBAN.INC. v. Drummond*, 508 S.W.3d 657, 675 (Tex. App.—Houston [1st Dist.] 2016, no pet.). We review imposing sanctions for an abuse of discretion. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007). We will reverse an assessment of sanctions only if the trial court acted without reference to any guiding rules and principles, such that its ruling was arbitrary or unreasonable. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009) (per curiam). "The trial court does not abuse its discretion if it bases its decision on conflicting evidence and some evidence supports its decision." *Id.* "However, a trial court abuses its discretion when its decision is contrary to the only permissible view of probative, properly-admitted evidence." *Id.* "In reviewing sanctions orders, the appellate courts are not bound by a trial court's findings of fact

and conclusions of law; rather, appellate courts must independently review the entire record to determine whether the trial court abused its discretion." *Darnell v. Broberg*, 565 S.W.3d 450, 461 (Tex. App.—El Paso 2018, no pet.).

"A court must generally presume that pleadings and other papers are filed in good faith, and the party asserting that sanctions are appropriate bears the burden of overcoming that presumption." *Id.* at 459. Accordingly, here, Appellees had the burden to support their motion for sanctions with competent proof that (1) a reasonable inquiry into the allegations in Itzi's and Pace's pleadings would have disclosed that not all the allegations had or would likely have evidentiary support, and (2) Itzi and Pace or Crawshaw did not make a reasonable inquiry before filing suit. *Unifund CCR Partners*, 299 S.W.3d at 97. "Incompetent evidence, surmise, or speculation will not suffice for the proof required." *Id.*

Under Rule 13, the signature of an attorney constitutes a certificate "that they have read the pleading, motion, or other paper; that to the best of their knowledge, information, and belief formed after reasonable inquiry the instrument is not groundless *and* brought in bad faith or groundless *and* brought for the purpose of harassment." TEX. R. CIV. P. 13 (emphasis added). "If a pleading, motion or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, after notice and hearing, shall impose an appropriate sanction . . . upon the person who signed it[.]" *Id.* "Courts shall presume that pleadings, motions, and other papers are filed in good faith." *Id.* "No sanctions under this rule may be imposed except for good cause, the particulars of which must be stated in the sanction order." *Id.*

"Groundless" "means no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law." *Id.* "[B]ad faith—for purposes of Rule 13—is more than bad judgment or acting negligently, and instead requires 'conscious doing

20

of a wrong for dishonest, discriminatory, or malicious purpose.'" *Darnell*, 565 S.W.3d at 463 (citation omitted). "Rule 13 requires sanctions based on the acts or omissions of the represented party or counsel—not merely on the legal merit of the pleading." *New York Underwriters Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 856 S.W.2d 194, 205 (Tex. App.—Dallas 1993, no pet.).

Under Chapter 10, "[t]he signing of a pleading or motion as required by the Texas Rules of Civil Procedure constitutes a certificate by the signatory that to the signatory's best knowledge, information, and belief, formed after reasonable inquiry":

> (1) the pleading or motion is not being presented for any improper purpose, including to harass or to cause unnecessary delay or needless increase in the cost of litigation;
>
> (2) each claim, defense, or other legal contention in the pleading or motion is warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
>
> (3) each allegation or other factual contention in the pleading or motion has evidentiary support or, for a specifically identified allegation or factual contention, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4) each denial in the pleading or motion of a factual contention is warranted on the evidence or, for a specifically identified denial, is reasonably based on a lack of information or belief.

TEX. CIV. PRAC. & REM. CODE ANN. § 10.001. The phrase "improper purpose" is the equivalent of "bad faith" under Rule 13. *See Dike v. Peltier Chevrolet, Inc.*, 343 S.W.3d 179, 183–84 (Tex. App.—Texarkana 2011, no pet.).

"A party may make a motion for sanctions, describing the specific conduct violating Section 10.001." *Id.* § 10.002(a). If a court determines a person has signed a pleading or motion in violation of § 10.001, it may impose a sanction on that person. *Id.* § 10.004(a). A sanction may include "an order to pay to the other party the amount of the reasonable expenses incurred by the

21

other party because of the filing of the pleading or motion, including reasonable attorney's fees." *Id.* § 10.004(c)(3).

Both Rule 13 and § 10.001 require an evidentiary hearing to enable the trial court to make necessary factual determinations about the motives and credibility of the person signing the allegedly groundless pleading. *See New York Underwriters*, 856 S.W.2d at 205; *Orbison v. Ma-Tex Rope Co.*, 553 S.W.3d 17, 35 (Tex. App.—Texarkana 2018, pet. denied). "Ultimately, the trial court is required to examine the signer's credibility taking into consideration all the facts and circumstances available to him at the time of the filing." *Home Owners Funding Corp. of Am. v. Scheppler*, 815 S.W.2d 884, 889 (Tex. App.—Corpus Christi 1991, no pet.). "Without hearing evidence on the circumstances surrounding the filing of the pleading and the signer's credibility and motives, the trial court has no evidence to determine that a party or its attorneys filed the pleading in bad faith or to harass." *New York Underwriters*, 856 S.W.2d at 205.

## B. Analysis

In their combined motion for summary judgment and sanctions, Appellees stated only the following as the basis for sanctions:

> After an adequate time for discovery, (all written discovery is complete, records have been obtained, and no oral discovery has been sought), it is clear that this suit is meritless in its entirety and there was no reason Lentegrity should have been named as a Defendant. As such, an award of sanctions is warranted.

At the summary judgment hearing, counsel for Appellees asserted the request for sanctions was because Lentegrity had been "dragged" into the litigation and there was no evidence it had done anything wrong. Counsel did not request sanctions based on the litigation against Aces Autos.

At the hearing on the amount of attorney's fees to be assessed, only two witnesses testified—Huc and Appellees' attorney. No evidence was adduced regarding the circumstances surrounding the filing of the action or the credibility and motives of Itzi, Pace, or Crawshaw in

22

filing the action. Following the hearing, the court signed findings of fact and conclusions of law in which it concluded all Itzi's and Pace's causes of action were groundless and violative of Rule 10 and Chapter 13. The trial court found "no wrongdoing alleged on the part of Lentegrity." The court made no findings that the pleadings were signed in bad faith, without good cause, for an improper purpose, or for the purpose of harassment.

Although a trial court may determine whether an action is groundless based on the totality of the tendered evidence produced, the court cannot determine bad faith or harassment based solely on such evidence. *See Splettstosser v. Myer*, 779 S.W.2d 806, 808 (Tex. 1989). Here, the record reflects no evidence was presented at the hearing about the facts available to Itzi, Pace, or Crawshaw and the circumstances existing at the time the challenged pleading was filed. Without hearing evidence on the circumstances surrounding the filing of the pleading and Crawshaw's credibility and motives, the trial court had no evidence to determine Crawshaw filed the pleading without good cause, for an improper purpose, or for the purpose of harassment. *See Alejandro v. Robstown Indep. Sch. Dist.*, 131 S.W.3d 663, 670 (Tex. App.—Corpus Christi 2004, no pet.) ("Having failed to receive into evidence the relevant facts regarding the circumstances surrounding the filing of the lawsuit, the trial court had no evidence before it to determine the motives and credibility of the person filing the allegedly groundless pleading or the relevant culpability of appellant or his attorneys."); *see also New York Underwriters*, 856 S.W.2d at 205 (holding, "summary judgment is inappropriate for deciding the motives and credibility of the person signing the alleged groundless petition" and concluding trial court erred in granting Hartford's motion for summary judgment on State Farm's counterclaim for relief under Rule 13). We conclude that, having failed to receive into evidence the relevant facts about the circumstances surrounding the filing of the lawsuit, the trial court had no evidence before it to determine the motives and

23

credibility of the person filing the allegedly groundless pleading or the relevant culpability of Crawshaw. Therefore, the trial court erred by assessing sanctions against Crawshaw.

## CONCLUSION

Because we conclude Appellees conclusively established their entitlement to a summary judgment on Appellants' claims, we affirm the trial court's take-nothing judgment in Appellees' favor. We reverse that portion of the trial court's order directing Crawshaw to pay Appellees $11,920 in attorney's fees and $470.40 in costs as sanctions.

JEFF ALLEY, Chief Justice

March 22, 2024

Before Alley, C.J., Palafox and Soto, JJ.